# McCulloch's Adm'r v. Abell's Adm'r (four cases).

(Decided March 25, 1938.)

CARY, MILLER & KIRK, THOMAS E. SANDIDGE and EUGENE R. ATTKISSON for appellant.

BELL, ROBERTSON & BELL and BECKHAM A. ROBERTSON for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

In separate actions, which were consolidated below and tried together, Joseph Leroy Abell's Administrator recovered a judgment against the estate of J. W. Mc-Culloch, Jr., for $7,500, and against A. L. Varnedoe for $5,000; Mary Evelyn Abell recovered a judgment against the estate of J. W. McCulloch, Jr., for $1,500, and against A. L. Varnedoe for $1,000; Elzie Raymcnd Abell recovered a judgment against the estate of J. W. McCulloch, Jr., for $600, and against A. L. Varnedoe for $400; and Elizabeth Abell recovered a judgment against the estate of J. W. McCulloch, Jr., for $1,500, and against A. L. Varnedoe for $1,000. The administrator of J. W. McCulloch, Jr.'s, estate and A. L. Varnedoe appeal, and the cases will be considered in one opinion.

The following recital of the evidence will be suffi-

cient to illustrate the questions presented. Late in the afternoon or early in the evening of October 10, 1934, Harry R. Abell, accompanied by his wife, Elizabeth, and their four children, was driving a wagon and team east on highway No. 60. He, his wife and one child were sitting on the plank seat of the wagon, and the other three children were behind them in the wagon bed. At the place of the accident the highway is practically straight for three-quarters of a mile. The concrete is 18 feet wide, and on each side there is a shoulder of about 4 feet. Beyond the shoulders on each side are ditches. Just prior to the accident the car in which McCulloch was traveling was approaching the rear of the wagon and the Varnedoe car was coming toward the wagon. According to the Abells, the team consisted of a horse and mule, and the right front and rear wheels of the wagon were off the concrete and on the shoulder of the road. They first saw the Varnedoe car as it came around a curve about 350 yards away, and when it was 200 yards away they saw the McCulloch car about the same distance in their rear, and they were both traveling at a high rate of speed. As the McCulloch car approached the wagon the driver turned the car toward the center of the concrete. The McCulloch car struck the back end of the wagon and they and the children were thrown out. At the same time the McCulloch car was caused to "flip around" and was left angling across the center of the concrete with its back over the center line. As the Varnedoe car drew nearer, it had two wheels on the side of the shoulder. When about 50 yards away the Varnedoe car left the shoulder of the road and pulled over to the center. The Varnedoe car plowed into the back end of the McCulloch car and the wagon, knocked the wagon into the ditch, killed the mule, hurt the horse, killed one of the children, and hurt the others. There was plenty of room for the Varnedoe car to pass. The Abells admitted that they had no light of any kind on the wagon, but testified that it was not dark at the time. "Red" Roberts, who was driving the McCulloch car, gives the following account of the accident: It was about a mile and a quarter beyond Maceo, and on a straightway. There was another car coming, and he was blinded by the lights. All of a sudden he came upon the wagon 20 or 25 feet away. He jerked the wheel as quickly as he could, threw on the brakes, and his right fender caught the left wheel of the wagon.

His car swerved around and into the lane of the approaching car. He was driving around 40 miles an hour, maybe a mile or so less, but not more than that.

Varnedoe testified as follows: He was driving a Buick car and his lights were burning. As he came into the straightway from the curve he thought he saw a dark spot on the left side of the road, and approached cautiously with his car under control. At the same time he noticed the car approaching in the same direction as the wagon. He drove his car to the right-hand side. When he got opposite the wagon the car suddenly swung right into his face. He whipped his wheel as hard as he could to turn off the highway, and jammed on his brakes. The other car was in his path and his left front fender crashed into the rear of the other car. He was about 70 or 75 feet away when he recognized the wagon, and he was going from 30 to 35 miles an hour. He was making possibly 40 miles when he came around the curve, but he had slowed down at the time of the accident. At no time did he turn or attempt to turn his car on the shoulder back upon the concrete, and never at any time did he get across the center line of the highway. When he first saw the lights on the other car it was approaching the wagon from the rear, and he was judging the distance so as to keep on his side of the road with ample clearance.

It is insisted on behalf of McCulloch's estate that the court erred in assuming in the instructions that the car driven by "Red" Roberts belonged to McCulloch. The argument is that the only evidence of ownership was the answer of "Red" Roberts, "as far as I know," to the question, "And the car belonged to Dub McCulloch?" and that this was without probative value. In the first place the answer was framed in such a way that it may be doubted if the denial of ownership made an issue, but, however that may be, there are other circumstances that cannot be overlooked. To make McCulloch's estate liable for "Red" Roberts' negligence it was not necessary, of course, to show actual ownership of the car by McCulloch, but sufficient to show that McCulloch was in the possession and control of the car, and that it was being driven by "Red" Roberts with his knowledge and consent. Louisville Lozier Company v. Sallee, 167 Ky. 499, 180 S. W. 841; Thixton v Palmer, 210 Ky. 838, 276 S. W. 971, 44 A. L. R. 1379; Marsee v. Bates, 235 Ky. 60, 29 S. W. (2d) 632. The only other

occupants of the car besides McCulloch were Roberts and Miss Smith, and it is not contended that either Roberts or Miss Smith owned or was in possession of the car. On the contrary, Roberts not only testified that the car belonged to McCulloch so far as he knew, but throughout the entire trial, and without objection on the part of McCulloch's estate, the car was repeatedly referred to as "the McCulloch car." As there was no evidence to the contrary, and possession and control were equivalent to ownership, the court did not err in assuming that McCulloch was the owner of the car, or in telling the jury that he was responsible for the negligence of Roberts.

By instruction No. 4 the court told the jury that if "Red" Roberts was driving at a greater rate of speed than 40 miles per hour, that was prima facie evidence of unreasonable speed, unless the traffic conditions were such as to make that rate of speed reasonable under the circumstances, and it is insisted that the instruction was not authorized by the evidence. In support of this position it is pointed out that Roberts had himself testified that he did not exceed 40 miles an hour, and the only evidence opposed to his statement is the evidence of the Abells that the McCulloch car was making a roaring noise and that Roberts was running at a high rate of speed. If this were all, a different question would be presented, but we find that the Abells testified that, when the Varnedoe car was about 200 yards away, the McCulloch car was about the same distance to their rear, and two witnesses say that as the Varnedoe car approached, it was going 60 or 70 miles an hour. Manifestly, if that be true, the McCulloch car, which reached the scene of the accident a little before the Varnedoe car, must have been going at practically the same rate of speed. We are therefore constrained to hold that the evidence was sufficient to authorize the instruction.

It is also insisted that the only negligence on the part of Varnedoe was excessive speed, and as the McCulloch car appeared in his pathway so quickly the result would have been the same, regardless of speed. In addition to the evidence of two witnesses that as he came down the road Varnedoe was driving 60 or 70 miles an hour, there is evidence to the effect that, when he was a few yards away, he turned his car from the shoulder over the center of the road, and, notwithstanding the position of the McCulloch car, there was room

enough for him to go by. Not only was there other evidence of negligence besides excessive speed, but as the ability to control a car plays an important part in avoiding accidents, and speed plays no small part in the matter of control, we are not prepared to say as a matter of law that, if Varnedoe had been driving at a reasonable speed, he could not have avoided the accident. On the contrary, we think there was sufficient evidence to take the case to the jury and sustain the verdict.

But it is said that as to Mrs. Elizabeth Abell and Mary Evelyn Abell, Varnedoe was entitled to a directed verdict on the ground that there was no evidence that their injuries resulted from the Varnedoe car striking the McCulloch car, and that the jury should not be permitted to speculate as to who was responsible for their injuries. Where, as here, there was really but a single accident resulting from the concurring negligence of two parties, it would hardly comport with fairness and justice to deny a recovery on the ground that the person injured could not tell exactly how much he was injured by each. In such a situation all that can be reasonably done is to let the jury consider all the circumstances and apportion the damages according to the amount of negligence attributable to each of the offending parties.

There is the further contention that the court erred in not defining the words "nighttime," "dark," and "negligence." The propriety of using the words "nighttime" or "dark" in the instructions we shall hereafter consider. Respecting the word "negligence" and other similar words, it is sufficient to say that the failure of the court to define them is not error in the absence of a request. Codell Construction Company v. Steele, 247 Ky. 173, 56 S. W. (2d) 955; Blue Grass Traction Company v. Ingles, 140 Ky. 488, 131 S. W. 278.

By instruction No. 5 given in each case the court told the jury that it was the duty of the driver of the wagon "to have a red light on the rear of his wagon, if it was nighttime or dark, visible for a distance of 250 feet, and a white light on the left side of the wagon to clearly reveal the outline of said vehicle so that same may be observed by an approaching vehicle for a distance of 100 feet."

By section 2739g-24, Kentucky Statutes, subsections (1) and (3), it is provided that all automobiles, motortrucks, bicycles, wagons, buggies, motorcycles,

and each and every other kind of vehicle used or operated upon any public highway, road, or street in the commonwealth of Kentucky are required to display lights as follows: At the rear one lighted lamp showing red visible from the rear 200 feet away, whether said vehicle be in operation or stationary, and that when in operation wagons, buggies, or any other slow-moving vehicles or motorless vehicles shall have at least one lighted lamp on the left side of said vehicle, whether from the front or rear showing white, and of sufficient power to clearly reveal the outline of the left side of said vehicle, and so that said outline may be observed by approaching vehicles from a distance of at least 100 feet. It is provided by section 2739g-23, Kentucky Statutes, that whenever lights are required they shall be displayed "during the period from one-half hour after sunset to one-half hour before sunrise, and at such other times as atmospheric conditions render visibility as low as, or lower than is ordinarily the case during said period, and that provisions as to distance mean under ordinary atmospheric conditions."

It will be observed that the statute does not use the word "nighttime" or "dark." It is evident that the Legislature in dealing with the question felt that it would be safer to have the required lights displayed during the period from one-half hour after sunset to one-half hour before sunrise, and so provided. That being true, the statute cannot be ignored, but should be enforced as written. It is in evidence that at the time of the accident the sun set at 5:15 p. m., and it was not dark until about an hour later. It is clear, therefore, that the use of the words "nighttime" or "dark" in the instruction was not a compliance with the statute. Where the statute speaks in no uncertain terms, it hardly can be said that the use in an instruction of other terms not meaning substantially the same thing is not prejudicial error.

It not appearing that the driver of the McCulloch car had been drinking, evidence that there was a pint of liquor in the car should have been excluded.

As each of the judgments must be reversed for the error in instruction No. 5, it is unnecessary to determine whether the damages are excessive.

Wherefore, the judgment in each case is reversed and cause remanded for a new trial consistent with this opinion.