**FARMLAND MUTUAL INSURANCE COMPANY, Appellant,**

v.

**Lemuel JOHNSON, Virginia Johnson; and A.L. Johnson Distribution, Inc., Appellees.**

No. 1998–SC–0938–DG.

Supreme Court of Kentucky.

Oct. 26, 2000.

As Modified on Denial of Rehearing Feb. 22, 2001.

Matthew J. Baker, Matthew P. Cook, Cole, Moore & Baker, Bowling Green, KY, for appellant.

Roy Lee Steers, Jr., Steers & Steers, Franklin, KY, for appellees.

LAMBERT, Chief Justice.

This litigation arises out of a disputed fire insurance claim. The insured stipulated that the amount of the loss was fairly debatable, and the insurer contends that a claim against it for bad faith under the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA") is thereby foreclosed. This and a multiplicity of other issues are raised in this appeal from a judgment upon a jury verdict awarding the plaintiffs punitive damages of $2 million for bad faith and violations and violations of the KUCSPA.

On April 22, 1992, a commercial building owned by Lemuel and Virginia Johnson, doing business as A.L. Johnson Distribution, was destroyed by fire. The building was insured by Farmland Mutual Insurance Company. The pertinent policy provisions of the insurance contract were:

I. PROPERTY INSURANCE

. . . .

C. LOSS SETTLEMENT CLAUSE

1. Real Property and Business Property

We will determine the value of covered property in the event of loss or damage at the *actual cash value* as of the time of the loss or damage. We will not pay more for loss or damage than the least of:

. . .

(b) The cost to repair or replace the lost or damaged property with similar property intended to perform the same function when replacement with identical property is impossible or unnecessary;

. . .

(d) The value of the damaged property.

VI. POLICY DEFINITIONS

THE FOLLOWING DEFINITIONS ARE MADE A PART OF THIS POLICY

. . .

2. *Actual cash value means the replacement cost of the property damaged or destroyed at time of loss, less depreciation.*

(emphasis added).

After the fire, Farmland retained Crawford and Company to adjust the claim. Crawford and Company assigned the case to its adjuster, Richard Shields. A dispute soon arose between the parties as to whether the premises should be repaired or completely re-built, and there was also a disagreement regarding the value of the loss. On behalf of Farmland, Shields took the position that the structure could be repaired and that the actual cash value of the property was the cost of repair less depreciation. He made only one offer, $168,993.18, to settle the claim. The Johnsons insisted that repairing the building with reasonable assurance of structural integrity would cost more than to rebuild it, and they also maintained that Shields' offer was too low.

After failing to reach an agreement with Farmland on the value of the property, the Johnsons filed a complaint in Simpson Cir-

cuit Court against Farmland, Crawford and Company, and Shields, alleging breach of the insurance contract and violations of the Kentucky Unfair Claims Settlement Practices Act. The Johnsons' basic theory of the case was that Shields had misrepresented a pertinent contract provision, resulting in a significantly decreased amount of recovery under the insurance contract, and that he had also conspired with Paul Davis Systems ("PDS"), a fire restoration contracting service, to create a repair estimate that Shields knew was too low.

The trial court ordered severance that the breach of contract and bad faith claims. In the breach of contract trial, which is not at issue here, the jury found that the cost of repairing the building exceeded the replacement cost and awarded the Johnsons $213,810 as the "actual cash value" of the premises. This amount represented what the jury believed to be the replacement cost, $251,541, minus depreciation. Thus, the "actual cash value" awarded was approximately $45,000 more than the only offer Shields had made to the Johnsons. Farmland appealed from that judgment, and the Johnsons took a cross-appeal. The Court of Appeals affirmed the judgment of the Simpson Circuit Court.

Thereafter, the bad faith claim was tried. The Johnsons alleged that Farmland committed four violations of the KUCSPA: (1) misrepresentation of pertinent policy provisions,[1] (2) failure to conduct a reasonable investigation,[2] (3) failure to attempt to bring about a fair and equitable settlement of the claim,[3] and (4) compelling the insureds to initiate litigation by offering an amount substantially less than the amount ultimately recovered.[4]

The Johnsons moved for summary judgment on the first issue, i.e., whether Shields misrepresented the policy provisions. From the record it was undisputed that Shields claimed that "actual cash value" meant the cost of *repair* less depreciation. Yet in fact the contract expressly stated that "actual cash value" was the cost of *replacement* less depreciation. The trial court thus granted the Johnsons' motion for partial summary judgment.

At trial on the remaining issues, the following evidence was presented. Two days after the fire, Shields met Johnson at the fire site. Shortly after Shields arrival, an employee of PDS also arrived. Johnson told Shields that he did not intend to rebuild the building as it had been. Thus Shields knew that it would be a cash adjustment, and that the value of the claim would never be tested in the marketplace. A few days later, Larry Smith, a local building contractor, went to the fire site to prepare an estimate for Johnson. When Smith arrived at the fire site, a PDS employee arrived and said to Smith, "You guys are wasting your time. I've already got this job." Smith immediately went to Johnson to ask if the PDS employee's statement was true. At this time, Johnson began to suspect collusion between Shields and PDS.

About one month after the fire, Shields left a phone message for Johnson offering to settle the claim for $168,993.18. It was later learned that this offer was based on the cost to repair the damaged property, less a deduction for depreciation. Shields first testified that he had based this one and only offer on his own repair estimate, but on cross examination he admitted that he had based the offer on the PDS repair estimate even though he knew it was too low. Shields' repair estimate was $220,000, and the PDS repair estimate was $203,000. Moreover, Shields testified that he was familiar with a prototype of the Johnsons' policy, but that he had never obtained a copy of the policy at issue from Farmland.

1. KRS 304.12–230(1).

2. KRS 304.12–230(4).

3. KRS 304.12–230(6).

4. KRS 304.12–230(7).

Farmland had made its own internal appraisal of the building two months before the fire. Yet Shields never asked Farmland about the appraisal, and Linda Dombkowski, who managed the claim for Farmland, never told Shields that she had it. Johnson thought that the appraisal represented the fair value of the claim. Farmland objected to the introduction of the appraisal, and the amount of the appraisal was excluded from evidence. However, the fact that the appraisal existed, the fact that Shields never asked about any appraisal by Farmland, and the fact that Dombkowski never pointed out the company's own appraisal to Shields were put before the jury.

On June 3, 1992, the Johnsons met with Shields in Louisville. Mr. Johnson told Shields that he thought the cost of adequate repairs would exceed the cost to demolish and replace the building. Johnson insisted that the claim should be adjusted based on the replacement cost of the building less depreciation, under subparagraph (C)(1)(d), rather than repair cost, under subparagraph (C)(1)(b). Nevertheless, at the Louisville meeting Shields reiterated Farmland's first and only offer of $168,993.18. Mr. Johnson insisted that a structural engineer be retained.

Shields retained Bill Mitchell, a structural engineer. Johnson hired his own structural engineer. Shields never asked Mitchell or PDS to determine whether the cost to repair would exceed the cost to replace, less depreciation, nor did he attempt to do so himself. Mitchell rendered his report in July 1992. After Shields received Mitchell's report, he refused to provide a copy to Johnson unless and until Johnson was in a position to exchange engineering reports. After receiving a letter from the Johnsons' attorney, Shield's agreed to send a copy of Mitchell's report to Johnson. The opening paragraph of the report stated,

> To limit cost, compensation to Structural Integrity, Inc. (SII) does not provide for removal of floor, ceiling, or wall coverings. The detailed examination of every structural member, even where visible, is also beyond the scope of SII's authorized work.... [T]he purpose of this inspection is to provide SII's opinion concerning the conditions observed based on a limited visual examination.

On the basis of Mitchell's inspection, Shields advised Johnson that the "previous offer ... still stands."

On August 3, 1992, Shields wrote Johnson as follows:

> We would like to have a reply from you within a week so that we can bring the claim to a conclusion and repairs can begin. Additional damages that occur as a result of delay in beginning repairs or additional loss of income as a result are not covered under the policy.

Upon receipt of this letter, Johnson began demolishing the building in order to resume business, which occurred on September 18, 1992. On September 28, 1992, Shields restated Farmland's offer and requested a response from Johnson. On September 30, 1992, Shields was told that Johnson had not completed his own investigation and could neither accept nor reject Farmland's offer at that time.

On October 28, 1992, Johnson informed Shields in a letter that his consultants, a structural engineer and a building contractor, had confirmed his opinion that repair cost would exceed replacement cost, which the building contractor had estimated would be $304,444.[5] Johnson also informed Shields that he was willing to compromise the entire claim for $260,000.[6]

---

5. At the contract trial, the Johnsons proved that the replacement cost of the building was $304,440. They asserted that this amount should be decreased by depreciation of $45,666.60 for an actual cash value award of $258,777.40.

6. Thus, subtracting the undisputed amount for content ($5,606.37) and debris removal ($4,320.00), Johnson's offer for the building and equipment was $250,073.63. At trial, Johnson claimed that he was prepared to

Without seeing any documentation from Johnson's consultants, Shields replied, "We feel that an accurate assessment was made of the loss" and restated Farmland's offer of $168,993.18 "made under the policy loss settlement clause, No. C1b, based on the cost of repairing the damaged property." This offer, as stated above, included a deduction for depreciation.

On November 9, 1992, Shields requested written reports from Johnson's consultants. At that time, Johnson had only received verbal reports to save expenses. He immediately requested written reports from his consultants, yet there was a delay in providing the reports to Shields. On December 10, 1992, Shields wrote Johnson asking about the reports and the Johnsons' attorney responded on December 15, 1992. There was no further contact between the parties until March 10, 1993, when Shields again inquired about the reports and reiterated Farmland's offer of $168,993.13, "based on the actual cost to repair the building, less applicable depreciation."

On April 6, 1993, copies of the reports were sent to Shields, and on April 20, 1993, Shields admitted that they "reflected some amount of hidden damage that was not visible to us, and that will be taken into consideration." Yet, on May 21, 1993, Shields restated Farmland's offer of $168,993.13. The Johnsons soon commenced litigation.

At trial of the bad faith claims, upon the foregoing evidence, the trial court submitted the case to the jury on special interrogatories that reflected the necessary elements required by the test adopted by this Court in *Curry v. Fireman's Fund Insurance Company.*[7] The jury found that Farmland had violated the three re-

maining provisions of the KUCSPA, and that it lacked a reasonable basis in law or fact for its conduct, and that it either knew there was no reasonable basis for its conduct or acted with reckless disregard thereof. The jury awarded the Johnsons $71,013.47 in compensatory damages, including attorneys fees and nontaxable litigation expenses. It also assessed two million dollars in punitive damages against Farmland. The jury also awarded $1,100,000 in damages against Crawford and Company and its adjuster, Shields, but this claim has been settled and is not pending on appeal.

Farmland appealed the judgment of the Simpson Circuit Court, and the Court of Appeals rejected all of Farmland's claims of error, except for the trial court's award of pre-judgment interest. The result was that the judgment was largely affirmed. Since the Johnsons agreed with Farmland that the trial court used the wrong basis for computing prejudgment interest, that issue is not presented on this appeal.

■ Farmland's first claim is that the bad faith claim should have been dismissed as a matter of law because Mr. Johnson stipulated that reasonable persons could have different opinions as to the value of the loss and whether the damaged structure should be repaired or replaced. In support of its contention, Farmland relies on *Empire Fire and Marine Ins. Co. v. Simpsonville Wrecker Service, Inc.,*[8] which states,

[I]f a particular claim is "fairly debatable," the insurer is entitled to debate that claim regardless of whether the debate concerns a matter of fact or one of law ... [A]n insurer is entitled to chal-

reduce this amount further if Farmland had increased its offer at all.

**7.** Ky., 784 S.W.2d 176, 178 (1989) (1. the insurer must be obligated to pay the claim under the terms of the policy, 2. the insurer must lack a reasonable basis in law or fact for denying the claim, and 3. it must be shown that the insurer either knew there was no reasonable basis for denying the claim or

acted with reckless disregard for whether such a basis existed); *Wittmer v. Jones,* Ky, 864 S.W.2d 885, 890 (1993); *Federal Kemper Insurance Company v. Hornback,* Ky., 711 S.W.2d 844, 846–847 (1986) (Leibson, J., dissenting).

**8.** Ky.App., 880 S.W.2d 886 (1994).

lenge a claim which is fairly debatable on the law or the facts. Thus, pursuant to *Curry*, it is clear that for purposes of Kentucky law, a tort claim for a bad faith refusal to pay must first be tested to determine whether the insurer's refusal to pay involves a claim which was fairly debatable as to either the law or the facts. If a genuine dispute does exist as to the state of the law governing the coverage question, the insured's claim is fairly debatable and the tort claim for bad faith based upon the insurer's refusal to pay the claim may not be maintained.[9]

Based upon this view, Farmland contends, it was entitled to engage in such a debate, and it was entitled to a directed verdict as a matter of law.

While the above quotation appears to support Farmland's position, in fact it does not. In *Empire Fire*, the insured sought reimbursement for loss occurring to cargo when the cargo, but not the vehicle carrying the cargo, struck a highway overpass. The insurer refused to pay the claim because the insured did not have all-risk cargo insurance coverage, but only limited insurance coverage for collisions between the insured vehicle and other vehicles and objects.[10] The Court of Appeals, in deciding whether a bad faith cause of action could be maintained against the insurer, noted that the issue of cargo collision coverage had not yet been addressed by Kentucky courts yet that the majority of other jurisdictions held that no coverage existed if the insured's cargo but not the carrier's vehicle struck another object such as an overpass.[11] Thus, the Court of Appeals held, the insurance company's refusal to pay was based upon a legitimate dispute regarding the status of the law, and the trial court should have granted a directed verdict on the bad faith claim.[12]

■ *Empire Fire* is thus distinguishable from the instant case, as it dealt with an insured's right to bring a bad faith case against its insurer when recovery, if any, under the insurance contract was dependent upon a legal issue of first impression in Kentucky courts. There is no such unresolved legal issue here. Moreover, *Empire Fire* does not stand for the proposition, suggested by Farmland, that a disputed factual matter requires dismissal of a bad faith claim as a matter of law. Although "an insurer is ... entitled to challenge a claim and litigate it if the claim is fairly debatable on the law or the facts," [13] the existence of jury issues on the contract claim does not preclude the bad faith claim.[14]

■ Farmland's position thus reflects an erroneous interpretation of the "fairly debatable" language. Although matters regarding investigation and payment of a claim may be "fairly debatable," an insurer is not thereby relieved from its duty to comply with the mandates of the KUCSPA. Although there may be differing opinions as to the value of the loss and as to the merits of replacing or repairing the damaged structure, an insurance company still is obligated under the KUCSPA to investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner. In other words, although elements of a claim may be "fairly debatable," an insurer must debate the matter fairly. As a result, Farmland was not entitled to dismissal of the bad faith claim as a matter of law.

9. *Id.* at 889–890 (citations omitted).

10. *Id.* at 887.

11. *Id.* at 888–889.

12. *Id.* at 890–891.

13. *See Guaranty National Ins. Co. v. George,* Ky., 953 S.W.2d 946, 949 (1997); *Kentucky Farm Bureau Mutual Ins. Co v. Troxell,* Ky., 959 S.W.2d 82 (1997); *Motorists Mutual Ins. Co. v. Glass,* Ky., 996 S.W.2d 437, 454 (1999).

14. *Federal Kemper Ins. Co. v. Hornback,* Ky., 711 S.W.2d 844, 847–848 (1986) (Leibson, J., dissenting); *Curry v. Fireman's Fund Ins. Co.,* Ky., 784 S.W.2d 176, 178 (1989) (*adopting dissent from Federal Kemper, supra* ).

The view expressed here is fully supported by a recent decision of the Supreme Court of Arizona, *Zilisch v. State Farm*,[15] in which the "fairly debatable" concept was analyzed. Among other things, the Court held that whether a claim or the amount of a claim is fairly debatable is a question of fact for the jury and that the fact of a disputed amount does not relieve the insurer of its duty to handle the claim fairly. As stated therein,

> But coming up with an amount that is within the range of possibility is not an absolute defense to a bad faith case. The carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim. It should do nothing that jeopardizes the insured's security under the policy. It should not force an insured to go needless adversarial hoops to achieve its rights under the policy. It cannot lowball claims or delay claims hoping that the insured will settle for less. Equal consideration of the insured requires more than that. The court of appeals therefore erred in concluding that fair debatability is both the beginning and the end of the analysis. . . . [16]

Summarizing its view of the law with respect to first party bad faith claims, the Court said:

> The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable.[17]

■ Farmland's second claim of error involves the misrepresentation claim upon which the trial court granted the Johnsons' motion for partial summary judgment. As stated above, the relevant contract provision stated, "Actual cash value means the replacement cost of the property damaged or destroyed at time of loss, less depreciation ." Shields, however, based Farmland's only offer upon the cost to repair the building, with depreciation deducted. The trial court agreed with the Johnsons' contention that the plain language of the policy made it clear that there were no genuine issues of material fact as to whether Farmland had misrepresented the policy provisions by insisting that depreciation be deducted from the cost of repairs if the claim were to be adjusted under subsection I(C)(1)(b) of the policy.

Farmland now offers several reasons why it believes summary judgment was improvidently granted. First, Farmland contends that the misrepresentation, if any, of the policy language was only a "technical violation" or "mere negligence" on the agent's part, and this will not support a bad faith cause of action.[18] Farmland further contends that the contractual provision at issue was not unambiguous but was open to another interpretation, as three of its witnesses so testified at trial, and one, Michael Breen, testified upon avowal. Such supporting evidence, Farmland notes, should have precluded summary judgment on the issue. Farmland further argues that there is no Kentucky case interpreting the policy language, and thus this is an issue of first impression as in *Empire Fire*.

In response, the Johnsons first point out that the partial summary judgment was entered four months before the bad faith trial began. None of Farmland's witnesses were presented while the motion for summary judgment was pending. Thus, the Johnsons maintain, there had been a complete adjudication of this issue long before the trial at which Farmland's witnesses testified regarding interpretation of the contract, and this evidence pre-

---

**15.** 196 Ariz. 234, 995 P.2d 276 (2000).

**16.** *Id.* at 280.

**17.** *Id* (citations omitted).

**18.** *Wittmer*, Ky., 864 S.W.2d 885, 890 (1993).

sented at the trial has no bearing on the validity of a previously granted partial summary judgment. Moreover, shortly before trial, Farmland requested that the trial court reconsider the partial summary judgment, but the trial court declined to modify it. The Johnsons submit that denial of the motion was within the trial court's discretion, and they further note that Farmland did not assert denial of the motion for reconsideration as error on this appeal.

Regardless, an examination of the merits of Farmland's claim indicates that it must fail. The only question on the motion for partial summary judgment was whether there was a genuine issue as to any material fact as to the application of the three-part bad faith test to the misrepresentation claim.

■ As to the first part, whether there was misrepresentation, in the breach of contract trial there was a lengthy argument on the instructions as to whether depreciation was to be deducted from repair cost under subparagraph 1(C)1(b) of the policy if the jury determined that repair cost was less than replacement cost. The trial court found that the policy language was not ambiguous and that the plain language of subparagraph (b) did not call for a depreciation deduction. The trial court thus ruled that if the jury found that repair cost was less than replacement cost, the amount awarded to the Johnsons would be the repair cost found by the jury, without a reduction for depreciation. The trial court's instructions were affirmed in the appeal of the contract trial judgment and thus became the law of the case for purposes of the bad faith trial. As such, in the bad faith proceedings, it had been established, as a matter of law, that Farmland misrepresented the policy by asserting that depreciation should be deducted from repair cost under subsection 1(C)1(b).

■ As to the second part of the bad faith test, there was no genuine issue of fact as to whether there was a reasonable basis in law or fact for Farmland's deducting depreciation from repair cost. The meaning and legal effect of the policy language are questions of law for the trial court,[19] and the trial court properly found that the policy language was not ambiguous. The policy clearly states that actual cash value means replacement cost less depreciation, yet Farmland claims that it could mean repair less depreciation because the additional contractual language "property damaged or destroyed" implies that some property will need to be repaired, as it is only damaged, whereas only the destroyed property will need to be replaced. This creative effort to subvert the plain language of the policy, however, is unpersuasive.

■ As to the third requirement for a bad faith claim, since the policy was unambiguous, the trial court found that Farmland either knew that there was no reasonable basis in fact for making the misrepresentation or acted with reckless disregard thereof. The trial court noted its belief that the law requires an insurance company to know what its policy says, and it recognized the distinction between knowing what the policy says and knowing how to apply the policy language to a given set of facts. We agree. Uncertainty as to application of insurance policy provisions, such as the coverage issue in *Empire Fire*, is a reasonable and legitimate reason for an insurance company to litigate a claim. Here, there was no such legal uncertainty, but blatant misrepresentation, made either intentionally or with reckless indifference to the rights of the Johnsons. Thus, Farmland's claim must fail.

■ Farmland's third claim is that the trial court erred in overruling its motion for summary judgment based upon the Johnsons' alleged failure to overcome the so-called "directed verdict test." In support of this claim, Farmland maintains that

**19.** *Morganfield National Bank v. Damien Eld-er and Sons,* Ky., 836 S.W.2d 893, 895 (1992).

if reasonable persons could differ on a question of fact on the underlying contract claim, then the insurer is entitled to judgment as a matter of law on the bad faith claim. Thus, continues Farmland's argument, since the trial court did not grant a directed verdict in favor of the Johnsons on the underlying contract claim, there can be no finding of bad faith regardless of Farmland's conduct in handling the claim. This argument is closely akin to Farmland's first claim of error based upon the "fairly debatable" language. As stated in our earlier discussion thereof, this view is not supported by Kentucky law and likewise must fail.

█ Farmland's fourth claim is that the trial court erred by excluding the testimony of its proffered witnesses Andrew Byler and Michael Breen. The latter, Michael Breen, has been a practicing attorney in Kentucky since 1983. His focus is on litigation, and he has written a book on bad faith law in this Commonwealth entitled, *Bad Faith Law in Kentucky: A Primer.* By avowal, Breen testified that in his opinion, giving consideration to the terms and provisions of the policy as those terms are applied within the industry, Farmland's interpretation of its policy regarding the taking of depreciation from repair costs was reasonable. He further testified that Farmland made a timely and reasonable settlement offer and also a reasonable basis for the settlement offer it made. In refusing to admit Breen's testimony, the trial court found that Breen had no experience working in the insurance industry, no experience adjusting claims from the insurance company's perspective, and no experience supervising the adjustment of insurance claims. With regard to fire claims, Breen had no experience investigating fire claims and had practiced only one fire case as an attorney.

█ Andrew Byler was the principal contractor of the fire-damaged structure when it was originally built. Byler testified at the contract claim trial that he could have completely rebuilt the building for $182,724. This testimony was entered into the record of the bad faith trial by avowal. The trial court excluded Byler's testimony because it was directed solely at the value of the Johnson's claim, and this value had been fully adjudicated during the first trial.

█ KRE 702, which governs the admission of expert testimony, provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, training, or education, may testify thereto in the form of an opinion or otherwise.

Application of KRE 702 is addressed to the sound discretion of the trial court.[20] An abuse of discretion occurs when a "trial judge's decision [is] arbitrary, unreasonable, unfair, or unsupported by sound legal principles." [21] A trial court's ruling on the qualifications of an expert should not be overturned unless the ruling is clearly erroneous.[22]

In *Goodyear Tire and Rubber Co. v. Thompson,*[23] this Court recently revisited the applicability of KRE 702 to expert testimony of a technical nature and held that it applies broadly to matters coming within the parameters of the rule. We also held that trial courts had broad discretion to determine whether proffered expert witnesses were qualified. A proper summary of our holding is as follows:

**20.** *Ford v. Commonwealth,* Ky., 665 S.W.2d 304, 309 (1983).

**21.** *Goodyear Tire and Rubber Co. v. Thompson,* Ky., 11 S.W.3d 575, 581 (2000).

**22.** *Commonwealth v. Rose,* Ky., 725 S.W.2d 588, 590 (1987) (*overruled on other grounds by Commonwealth v. Craig,* Ky., 783 S.W.2d 387, 389 (1990)..

**23.** Ky., 11 S.W.3d 575, 581 (2000).

"KRE gives the trial court the discretionary authority, reviewable for its abuse, to determine the admissibility of expert testimony in light of the particular facts and circumstances of the particular case. The discretion given to a trial court in determining the admissibility of expert testimony is 'discretion to choose among reasonable means of excluding expertise that is fausse and junky.' "[24] Based upon this standard of review, the trial court's refusal to admit the testimony of Byler and Breen did not constitute an abuse of discretion. In this case, Breen was found not to be qualified as an expert based upon a paucity of experience in adjusting fire damage claims.[25] Moreover, Byler's testimony was not relevant to the issues in the bad faith trial, although it was relevant in the first trial, and in that forum had been duly admitted. The trial court's exclusion of this evidence was thus not arbitrary or unfair, but was based upon sound legal principles and well within its discretion.[26]

Farmland's fifth claim is that the trial court committed reversible error by excluding certain evidence regarding the Johnsons' conduct during the course of negotiation of the claim. The evidence to which Farmland refers is the Johnsons' initial claim as to the value of the loss and their initial position at the first trial on the underlying contract regarding the value of the loss. As aforementioned, the amount the Johnsons claimed was owed to them by Farmland exceeded the amount ultimately awarded by the jury on the contract claim. Farmland contends that because of this disparity, the Johnsons 'opened the door' to inclusion at trial of all demands regarding the value of the loss that were made by the Johnsons. Farmland concludes this argument by asserting that the duty of good faith imposed on the parties to an insurance contract is a "two-way street," with the implication being that the Johnsons' demands in excess of the amount awarded demonstrate that they did not deal in good faith with Farmland.

In response, the Johnsons point out two significant facts. First, the trial court did not exclude the evidence at issue, but limited its scope. The evidence was admitted for the specific purpose of showing how the Johnsons' conduct influenced and reflected upon the state of mind of the defendants. Second, with regard to Farmland's "two-way street" argument, the propriety of the Johnsons' conduct was litigated at the first trial. There, the trial court submitted to the jury all of Farmland's claims regarding the Johnsons' violations of the contract terms, but the Johnsons prevailed nevertheless. Thus, Farmland's claim must fail.

■■ Farmland's sixth claim of error is that the KUCSPA is contrary to § 59 and § 60 of the Constitution of Kentucky, which prohibit the enactment of special legislation. In support of its assertion that the KUCSPA is unconstitutional, Farmland argues that if an insured is afforded a right and remedy under the KUCSPA, then it follows that an insurer should be afforded the same right and remedy in order to avoid the prohibition against special legislation. Although the duties of good faith imposed by an insurance contract are reciprocal, as Farmland points out, the KUCSPA does not afford reciprocal rights and remedies.[27] Farmland also implies that since certain features of the Workers' Compensation Act have been

24. *Id.* at 583.

25. Compare the experience of the proffered expert witness in *Goodyear* with the experience possessed by Breen. Despite possessing what appeared to be abundant experience, this Court affirmed exclusion of the proffered expert testimony in *Goodyear,* relying on trial court discretion.

26. *Commonwealth v. English,* Ky., 993 S.W.2d 941, 945 (1999).

27. The term "person" in KRS 304.12–220 specifically exempts an insured.

construed to be outside the scope of the KUCSPA, with the result that workers' compensation insurers are subject to different rules than other insurers, then the KUCSPA amounts to impermissible special legislation.

■ This Court recently reiterated the two-part standard for determining whether a statute is unconstitutional special legislation. A legislative act does not constitute "special legislation" if: 1) it applies equally to all in a class, and 2) it has distinct and natural reasons inducing and supporting the classification.[28] With regard to the first factor, this Court has stated, "A general law relates to persons or things as a class, whereas a special law relates to particular persons or things of a class."[29] With regard to what constitutes a permissible classification, this Court has stated, "Classifications based upon reasonable and natural distinctions that relate logically to the purpose of the Act do not violate Section 59 of the Kentucky Constitution."[30]

The KUCSPA is part of a large statutory scheme entitled, the "Insurance Code." The Insurance Code regulates the insurance industry, and an insurance company derives its right to do business in Kentucky from the Code. The Code and the KUCSPA within it relate to a class encompassing all insurance companies doing business in Kentucky that are regulated by the Kentucky Insurance Commissioner.[31]

Thus, the statute does not relate to only particular persons or things in that class.

Insofar as the exclusion of the insureds from the scope of KUCSPA is concerned, the legislative decision to exclude the insured from the class is reasonable and natural. One reason for this distinction is that the insured is not in the insurance business. A second reason is that a bad faith action is based upon the fiduciary duty owed by an insurance company to its insured based upon the insurance contract.[32] The KUCSPA is designed to "protect the public from unfair trade practices and fraud."[33] Furthermore, the disparate bargaining positions of an insured and an insurer following a loss are sufficient to justify treating the insureds as a different class for purposes of inclusion within the scope of the act.

We are not persuaded that this Court's holding in *Windchy v. Friend*[34] and the Court of Appeals' holding in *General Accident Insurance Company v. Blank*[35] lend support to Farmland's claim. Workers' compensation insurance is different from other forms of liability insurance. The KUCSPA is part of the Insurance Code, whereas the Workers' Compensation Act is part of the labor and human rights statutes. Moreover, different commissioners supervise the different areas of insurance and labor, and different regulations have been adopted for each.

■ Farmland's seventh claim is that the trial court erred by not instructing the

**28.** *Waggoner v. Waggoner*, Ky., 846 S.W.2d 704, 707 (1992), *cert. denied* 510 U.S. 932, 114 S.Ct. 346, 126 L.Ed.2d 310 (1993); *citing Schoo v. Rose*, Ky., 270 S.W.2d 940, 941 (1954).

**29.** *Waggoner* at 706 (*citing Johnson v. Commonwealth*, 291 Ky. 829, 165 S.W.2d 820 (1942)).

**30.** *Waggoner* at 707 (*citing Kling v. Geary*, Ky., 667 S.W.2d 379 (1984)).

**31.** *See General Accident Insurance Co. v. Blank*, Ky.App., 873 S.W.2d 580 (1993).

**32.** *See Federal Kemper*, 711 S.W.2d 844 (1986) (Leibson, J., dissenting); *Feathers v. State*

*Farm Fire and Casualty Co.*, Ky.App., 667 S.W.2d 693, 696 (1983) (*overruled by Federal Kemper*, Ky., 711 S.W.2d 844, 845 (1986) (*overruled by Curry* ).

**33.** *State Farm Mutual Automobile Ins. Co. v. Reeder*, Ky., 763 S.W.2d 116, 118 (1988).

**34.** Ky., 920 S.W.2d 57 (1996) (the Special Fund could not be subjected to the penalties of the KUCSPA).

**35.** Ky.App., 873 S.W.2d 580, 582 (1993) (workers' compensation insurance carriers not subject to the KUCSPA).

jury in accordance with KRS 411.184(2), a provision of the Kentucky punitive damages statute.[36] In support of this claim, Farmland contends that the instructions do not accurately "mirror" the statute, as it believes the requirement to be.[37] Such precise reflection, however, is not required. KRS 411.184(5) states, "This statute is applicable to all cases in which punitive damages are sought and supersedes any and all existing statutory or judicial law *insofar as such law is inconsistent with the provisions of this statute*" (emphasis added). This provision does not mandate that the instruction be an exact replica of the language of KRS 411.184(2), but states only that KRS 411.184(2) takes precedence over any existing *inconsistent* law.

KRS 411.184 became effective July 15, 1988, before this Court's decision in *Curry*[38] adopting the three-part test for a bad faith claim from the dissent in *Federal Kemper.*[39] This Court has continued to recognize the validity of this standard.[40] The bad faith instructions given here were entirely consistent with *Wittmer v. Jones*[41] and *Curry v. Fireman's Fund*[42] and were presented by means of special interrogatories.[43]

36. In *Williams v. Wilson*, Ky., 972 S.W.2d 260, 262–265 (1998), this Court declared KRS 411.184(1)(c) unconstitutional as a violation of the jural rights doctrine. For an award of punitive damages, KRS 411.184(1)(c) required a determination that the defendant acted with "flagrant indifference to the rights of the plaintiff and with a subjective awareness that such conduct will result in human death or bodily harm." The holding was based upon the new statutory standard's departure from the traditional common law standard that permitted a jury to impose punitive damages upon a finding of gross negligence.

*Williams* also held that the constitutionality of KRS 411.184(2) was not properly before the Court. Farmland's objection to the instructions here relate to this latter provision, KRS 411.184(2), which has not been held unconstitutional and the constitutionality of which has not been challenged in this case. KRS 411.184(2) provides: "A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud, or malice."

As this appeal was practiced without any challenge to the constitutionality of KRS 411.184(2) and statutes are presumed to be constitutional, to the extent it applies here, KRS 411.184(2) would have the same dignity as any other statute.

37. *See Sorg v. Purvis*, Ky., 487 S.W.2d 943, 945 (1972) ("It is fundamental that an instruction based on a statute should encompass the wording of a statute so far as possible").

38. Ky., 784 S.W.2d 176, 177–78 (1989).

39. Ky., 711 S.W.2d 844, 846–849 (1986) (Leibson, J., dissenting).

40. *Wittmer v. Jones*, Ky., 864 S.W.2d 885, 890 (1993); *Guaranty National Ins. Co. v. George*, Ky., 953 S.W.2d 946, 948–949 (1997); *see also Empire Fire and Marine Ins. Co. v. Simpsonville Wrecker Service, Inc.*, Ky.App., 880 S.W.2d 886, 888 (1994).

41. Ky., 864 S.W.2d 885 (1993).

42. Ky., 784 S.W.2d 176 (1989).

43. The jury answered nine interrogatories relating to Farmland's investigation, whether it attempted a fair and equitable settlement, and whether the Johnsons were required to institute litigation. The interrogatories propounded and the unanimous answers from the jury are as follows:

INSTRUCTION NO. 4
(INVESTIGATION)
PLEASE ANSWER THE FOLLOWING:
Do you believe, from the evidence presented in this case, that the defendants conducted a reasonable investigation, based upon all available information?

(CHECK ONLY ONE) Yes ___ No _✓_

INSTRUCTION NO. 5
(INVESTIGATION)
PLEASE ANSWER THE FOLLOWING:
Do you believe, from the evidence presented in this case, that the defendants had a reasonable basis in fact for believing that they had conducted a reasonable investigation, based upon all available information?

(CHECK ONLY ONE) Yes ___ No _✓_

INSTRUCTION NO. 6
(INVESTIGATION)
PLEASE ANSWER THE FOLLOWING:
Do you believe, from the evidence presented in this case, that the defendants knew there was no reasonable basis in fact for

The findings of fact which emerge from the court's interrogatories reveal the jury's belief that Farmland knowingly or recklessly failed in its duty to investigate, knowingly or recklessly failed to attempt a good faith settlement, and knowingly or recklessly compelled the Johnsons to initiate litigation to recover amounts due them under the policy. While the interrogatories submitted were based on the *Wittmer/Curry* factors, to the extent applicable, the findings required by the interrogatories are more than sufficient to satisfy KRS 411.184(2). An examination of the findings of the jury in this case leaves no doubt as to its belief that Farmland acted in an oppressive, fraudulent or malicious manner.

Farmland also asserts other claims of error regarding the jury instructions. These claims have been examined and found to be without merit. They will not be addressed herein.

Farmland's eighth claim of error relates to Andrew Byler's excluded testimony, which was placed in the record by avowal. Farmland contends that it should have been permitted to present Byler's testimony in the bad faith trial to show that even under a replacement analysis, Farmland's offer to the Johnson's was fair and was made in good faith.

Byler was allowed to testify at the first trial where the issue was how much was due under the policy. On the issue of bad faith, however, Byler's testimony was irrelevant because it had no bearing on Farmland's conduct prior to litigation. It appears that Byler's estimate was not procured until after litigation was initiated, as his name did not surface in this case until October 31, 1994, when he was designated as a trial witness more than a year after suit was filed. Thus, Farmland did not have Byler's replacement estimate at the time Shields made the offer to the Johnsons, and the offer could not have been based upon any information received from Byler. Byler's testimony was relevant to the contract claim, but not to the bad faith

believing that they had conducted a reasonable investigation, based upon all available information, or that the defendants acted with reckless disregard for whether such a basis existed?

(CHECK ONLY <u>ONE</u>)　　Yes __✓__　No ___

INSTRUCTION NO. 7
(FAIR AND EQUITABLE SETTLEMENT)
PLEASE ANSWER THE FOLLOWING:

Do you believe, from the evidence presented in this case, that the defendants attempted in good faith to effectuate a fair and equitable settlement of the claim, after liability had become reasonably clear?

(CHECK ONLY <u>ONE</u>)　　Yes ___　No __✓__

INSTRUCTION NO. 8
(FAIR AND EQUITABLE SETTLEMENT)
PLEASE ANSWER THE FOLLOWING:

Do you believe, from the evidence presented in this case, that the defendants had a reasonable basis in fact for believing that they had attempted to effectuate a fair and equitable settlement of the claim?

(CHECK ONLY <u>ONE</u>)　　Yes ___　No __✓__

INSTRUCTION NO. 9
(FAIR AND EQUITABLE SETTLEMENT)
PLEASE ANSWER THE FOLLOWING:

Do you believe, from the evidence presented in this case, that the defendants knew there was no reasonable basis in fact for believing that they had attempted to effect a fair and equitable settlement of the claim, or that the defendants acted with reckless disregard for whether such a basis existed?

(CHECK ONLY <u>ONE</u>)　　Yes __✓__　No ___

INSTRUCTION NO. 10
(COMPEL TO INSTITUTE LITIGATION)
PLEASE ANSWER THE FOLLOWING:

Do you believe, from the evidence presented in this case, that the defendants compelled the plaintiffs to institute litigation to recover amounts due under the subject policy by offering substantially less than the amounts which were ultimately recovered?

(CHECK ONLY <u>ONE</u>)　　Yes __✓__　No ___

INSTRUCTION NO. 11
(COMPEL TO INSTITUTE LITIGATION)

Do you believe, from the evidence presented in this case, that the defendants had a reasonable basis in fact for believing that, by their conduct, they were not compelling the plaintiffs to institute litigation to recover amounts due under the subject policy by offering substantially less than the amounts which were ultimately recovered?

claim because the information sought to be admitted did not influence Farmland's handling of the claim.

 Farmland's ninth and final claim of error is that the jury's verdict awarding two million dollars in punitive damages is preposterous—that it shocks the conscience and thus should not be permitted to stand. In support of this contention, Farmland asserts that there was an insufficient relationship between the amount of the award and the facts upon which the award was based to justify such an amount.

 A reviewing court, however, may not substitute its judgment for that of the jury as to the appropriate amount of exemplary damages.[44] The question of whether a jury's verdict is excessive is within the trial court's discretion, and an award will be overturned only if there has been an abuse of discretion.[45] In this case, there was no such abuse. The purpose of punitive damages is to punish an entity for engaging in impermissible conduct.[46] At trial, the Johnsons presented a detailed argument explaining, amongst other things, that only one out of one hundred insureds would have had the motivation and financial strength to litigate a disputed insurance claim rather than settling the case, and that any punitive damage award of less than $4,455,000 made it statistically more profitable for Farmland and Shields to deal with other insureds in the same manner they dealt with the Johnsons rather than in a fair manner. The two million dollars awarded by the jury was significantly less than that which it was argued

would have an adequate deterrent effect. Thus, the trial court did not abuse its discretion in allowing the verdict to stand, and the verdict should not be overturned. The evidence against Farmland revealed a course of deception and indifference which would reasonably cause a jury to inflict such punishment as would be required to deter such conduct in the future.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

JOHNSTONE, STUMBO and WINTERSHEIMER, JJ., concur.

COOPER, J., files a dissenting opinion in which GRAVES, J., joins, and in which KELLER, J., joins only as it pertains to the exclusion of the testimony of the witness, BYLER.

GRAVES, J., files a dissenting opinion in which COOPER, J., joins only as to Part II and Part III.

COOPER, Justice, dissenting.

I agree with Justice Graves that the trial court erred in failing to instruct the jury in accordance with KRS 411.184(2) and abused his discretion in finding the witness, Michael Breen, insufficiently qualified to render expert testimony on the issue of bad faith.[1] I write separately because I believe the trial court also erred in excluding the testimony of Andrew Byler.

One of the bases for the finding of bad faith in this case was a violation of KRS 304.12–230(6), *i.e.*, failure to attempt in good faith to effectuate a prompt, fair and

(CHECK ONLY <u>ONE</u>) Yes ___ No ✓

44. *Hanson v. American National Bank and Trust Company*, Ky., 865 S.W.2d 302, 311 (1993).

45. *Davis v. Graviss*, Ky., 672 S.W.2d 928, 932–933 (1984).

46. *See* KRS 411.184(1)(f) (punitive damages are "awarded against a person to punish and to discourage him and others from similar conduct in the future").

1. Contrary to the assertion in the majority opinion, slip op. at 18 note 25, at 379 the testimony of the proposed expert in *Goodyear Tire and Rubber Co. v. Thompson*, Ky., 11 S.W.3d 575 (2000) was not suppressed because of any deficiency in the witness's credentials, but because the subject matter of his proposed testimony did not satisfy the test for scientific reliability established in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

equitable settlement of the claim. Farmland's claims adjuster offered the Johnsons $168,993.18 to settle their claim. The jury in the contract trial found that the Johnsons were entitled to $213,810.00, representing a replacement cost of $251,541.00, less depreciation. Byler was the principal contractor of the structure when it was originally built. He was prepared to testify in the bad faith trial that he could have rebuilt the building from the slab up for $182,724.00.

The majority opinion asserts that Byler's testimony was irrelevant to the issue of bad faith, but does not explain why. The trial court held that Byler's testimony was irrelevant because the actual replacement cost of the building had already been established in the contract trial. While I agree that the actual replacement cost of the building was not the ultimate issue in the bad faith trial, whether Farmland's settlement offer of $168,993.18 was fair and equitable was the ultimate issue, and Byler's proposed testimony was entirely relevant to that determination. The fact that the jury in the contract trial accepted neither Byler's replacement cost estimate of $168,993.18 nor Johnsons' expert's replacement cost estimate of $304,440.00, but instead found the replacement cost to be $251 541 00 does not automatically mean that Farmland's settlement offer was made in bad faith. After subtracting depreciation as required by the insurance contract the jury's verdict in the contract trial was $213,810.00. If the same amount of depreciation is subtracted from Byler's replacement cost estimate, that estimate would have supported a settlement offer of $144,993.00, or $24,000.00 less than Farmland's offer.

Evidence that the contractor who actually built the original building could have replaced it for $24,000.00 less than Farmland's gross settlement offer before depreciation was highly relevant to a determination of whether Farmland's offer was a fair and equitable attempt to settle the claim.

The exclusion of that evidence was prejudicial error.

The majority opinion essentially holds that the reasonableness of a settlement offer is measured only by hindsight, *i.e.*, only against the ultimate verdict and not by the facts available to the insurer at the time the offer was made; and if the settlement offer does not equal or exceed the ultimate verdict, it is *ipso facto* made in bad faith and the claimants are entitled to punitive damages. That, of course, is a significant departure from the holding in *Wittmer v. Jones*, Ky., 864 S.W.2d 885 (1993) that bad faith occurs only when the insurer's conduct is "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Id.* at 890 (quoting *Federal Kemper Ins. Co. v. Hornback*, Ky., 711 S.W.2d 844, 848 (1986) (Leibson, J., dissenting) and Restatement (Second) Torts § 909(2) (1979)).

Accordingly, I dissent.

GRAVES, J., joins this dissent.

KELLER, J., joins this dissent only as it pertains to the exclusion of the testimony of the witness, BYLER.

GRAVES, Justice, dissenting.

Respectfully, I dissent.

In mid-March 1992, Appellant issued an insurance policy to Appellees, which covered, among other things, fire loss. One month later, the covered property was damaged by arson and Appellees made a claim under the policy. Appellant retained Crawford & Company as adjusters and Crawford assigned Richard Shields to the case. The parties eventually disputed the value of the loss and whether the property could be reasonably repaired or had to be rebuilt from the ground up. In the first trial, the jury ultimately awarded Appellee $213,810.00 as the actual cash value of the premises. In the second trial, a bad faith action, the jury returned a verdict of $71,013.47 in attorneys fees and $3.1 million in punitive damages: $2 million

against Appellant, $1 million against Crawford, and $100,000 against Shields. While Crawford and Shields have settled, Appellant has appealed, among other things, what it sees as an excessive verdict.

While Appellant is entitled to a new trial on other grounds, the error with this proceeding which most desperately needs to be addressed is the availability of punitive damages in Kentucky's civil suits.

## I. PUNITIVE DAMAGES ARE QUASI-CRIMINAL PENALTIES WITHOUT SAFEGUARDS OF CRIMINAL TRIALS

In 1988, the Kentucky General Assembly indicated its misgivings about punitive damage awards and attempted tort reform by enacting KRS 411.184. The statute redefined circumstances, and increased the burden of proof necessary to recover punitive damages. We ultimately held some of this legislation unconstitutional, which will be discussed in more detail below. However, under KRS 411.184(f), a section unaffected by our ruling on the statute's constitutionality, punitive damages include "exemplary damages and means damages, other than compensatory and nominal damages, awarded against a person to punish and to discourage him and others from similar conduct in the future." This focus on punishment and deterrence is inappropriate in the civil law context.

Proponents of punitive damages point to the long history of such awards, which stems back to ancient civilizations, including Babylon, Egypt, Greece, and Rome. Even the Bible suggests the use of punitive damages in some instances, as in this passage from Exodus: "[I]f a man shall steal an ox or a sheep, and kill it or sell it, he shall restore five oxen for an ox, four sheep for a sheep." The problem with relying on this ancient basis to reaffirm the inherent correctness of punitive damages is that these civilizations made no attempt to distinguish civil from criminal law. Alan Calnan, *Ending the Punitive Damages Debate*, 45 DePaul L.Rev. 101, 105 (1995). Because common law developed into two branches, civil, which focuses on compensation, and criminal, which focuses on punishment, it no longer needs punitive damages, a hybrid category which imposes penalties in excess of compensation on civil defendants.

While the concept is accepted in most jurisdictions, including ours since the decision in *Chiles v. Drake*, 59 Ky. 146 (1859), some state courts realized well before the 20th century that something was wrong with the imposition of a penalty without the protections of a criminal trial. The Supreme Court of New Hampshire, one of the earliest American courts to hold so, stated, "The idea is wrong. It is a monstrous heresy. It is an unsightly and unhealthy excrescence, deforming the symmetry of the body of law." *Fay v. Parker*, 53 N.H. 342, 382 (1872).

While the United States Supreme Court regularly upholds such awards, *see BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (guidelines given for determining an appropriate award), various members of that Court have voiced concerns about the appropriateness of punitive damages. Justices O'Connor and Scalia espoused some of these concerns in their dissent in *Bankers Life and Cas. Co. v. Crenshaw*, 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988), and added that the imposition of standardless discretion to determine the severity of punishment could be inconsistent with due process. *Id.* at 87, 108 S.Ct. at 1656.

In his dissent in *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), Justice Rehnquist gave three rationales for the awarding of punitive damages: punishing the defendant, deterring the defendant from similar conduct in the future, and acting as a bounty to encourage private lawsuits seeking to assert legal rights. Punitive damages are also thought to have arisen as an additional means of compensation, for such costs as attorneys

fees and damages from emotional injuries, which historically were not recoverable in tort. 22 Am.Jur.2d, *Damages* § 732 (1988). No matter which rationale is given for punitive damages, the argument fails.

The compensation rationale is the most quickly dismissed. Emotional harm, attorneys fees, and pain and suffering are regularly recoverable under current tort law. As noted in James B. Sales and Kenneth B. Cole, *Punitive Damages: A Relic That Has Outlived Its Origins,* 37 Vand.L.Rev. 1117 (1984) at 1161, high compensatory damages often have a sufficient deterrent effect and should they not, the plaintiff can seek an injunction, which, if violated, would subject the defendant to criminal sanctions. Thus the plaintiff, being fully compensated, has no interest in punishing the defendant. As the Washington Supreme Court noted in an early case, "Surely the public can have no interest in exacting a pound of flesh." *Spokane Truck & Dray Co. v. Hoefer,* 2 Wash. 45, 25 P. 1072, 1074 (1891). But even if the public had such an interest, punitive damages should go to the state on behalf of the public and not to the plaintiff.

The most egregious problem with punitive damages is that they attempt to punish and deter conduct without providing the safeguards of a criminal trial, such as the requirement of proof beyond a reasonable doubt, the prohibition against self-incrimination, and the security of the codification of law. In his *Wade, supra,* dissent, Rehnquist stated:

> [P]unitive damages are frequently based upon the caprice and prejudice of jurors. We observed in *Electrical Workers v. Foust,* [442 U.S. 42, 50–51 n. 14, 99 S.Ct. 2121, 2126–2127 n. 14, 60 L.Ed.2d 698 (1979) ] that "punitive damages may be employed to punish unpopular defendants," and noted elsewhere that "juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the harm caused." Finally, the alleged deterrence achieved by punitive damages awards is likely out-

weighed by the costs—such as the encouragement of unnecessary litigation and the chilling of desirable conduct. . . .

461 U.S. at 59, 103 S.Ct. at 1641–42.

Furthermore, if the conduct is both tortious and criminal, a defendant could be forced to face a kind of double jeopardy: a civil trial resulting in the imposition of punitive damages and a criminal trial resulting in fines or imprisonment. Finally, particularly in the business context, punitive damages have a tendency to punish not those who acted tortiously, but innocents: shareholders, through lower profits, or consumers, through higher prices. The blending of civil and criminal penalties defies reason and should be abolished.

Awards of punitive damages are an anomaly of our legal system. Although they are assessed in connection with the common-law tort system—which has as its overriding goal the compensation of private parties for actual injuries—punitive damages are imposed to serve the identical purposes of the criminal law: retribution and deterrence. But the punitive damage system lacks every protection of the criminal justice system. Criminal punishments can be imposed only in prosecutions by disinterested public officials who serve the public interest. They may be imposed only pursuant to clear legislative standards and punishment levels. And criminal prosecutions are subject to a panoply of explicit constitutional procedural safeguards.

Punitive damages, on the other hand, are pursued by self-interested private bounty hunters who are motivated to impose the largest possible punishment in every case. They are assessed in unlimited amounts for violation of vague, elastic, retroactive, and highly subjective standards of conduct. And, while punitive damage defendants are not afforded the numerous procedural rights of the criminal system, punitive damage awards often vastly exceed criminal punishments for comparable conduct.

The purpose of punitive damages is to punish an offender rather than to compensate a victim. The goals of punishment include: retribution, which here means to give a wrongdoer his "just dessert:" and deterrence, in creating an economic disincentive to engage in prohibited activity. In this regard, punitive damages more closely resemble a criminal, rather than civil, sanction.

Under the criminal law, of course, any fines levied as punishment are paid to the state and not the victim. This conforms with the notion that it is society as a whole which has an interest in maintaining order and public safety. In light of this generally accepted premise, the award of punitive damages to the victim represents an anomaly. As the Wisconsin Supreme Court noted over a century ago: "It is difficult on principle to understand why, when the sufferer by a tort has been fully compensated for his suffering, he should recover anything more. And it is equally difficult to understand why, if the tortfeasor is to be punished by exemplary damages, they should go to the compensated sufferer, and not the public in whose behalf he is punished." *Bass v. Chicago & Northwestern Railway Co.*, 42 Wis. 654, 672 (1877) (conc.opinion, Ryan, C.J.).

Punitive damages invite jurors to rely on private beliefs and personal predilections. Juries are permitted to target unpopular defendants, penalize unorthodox or controversial views, and redistribute wealth.

The arguments for and against punitive damages that have developed over time are well-defined. Some lawyers argue that punitive damages: (1) serve a wholly distinct function from compensatory awards in that they deter and punish wrongful conduct; (2) encourage the continued development of safer work practices and products; and (3) are subject to review by trial and appellate courts, with new trials as a viable check on a jury's abuse of discretion or unreasonable awards bearing little relationship to the facts of the case or the award of compensatory damages. Other lawyers argue that punitive damages: (1) are a mere surrogate for compensatory damages; (2) are often awarded by juries given unfettered discretion based on ill-defined jury instructions to award as much as they feel is necessary to punish; and (3) are violative of constitutionally-protected procedural and substantive rights. In particular, the constitutional challenges raised most frequently in recent years are violations of the Due Process Clause of the Fourteenth Amendment.

Punitive damages present a persistent problem of lack of uniformity and vagueness of standards. Of greater concern is the chilling effect the unfettered discretion given jurors in considering punitive awards will have upon defendants in attempting to adequately assess the risks associated with litigating claims.

In *Bankers Life & Casualty Co. v. Crenshaw, supra,* the Court declined to discuss the constitutional issues of punitive damages. However, Justice O'Conner, joined by Justice Scalia, stated in her concurrence:

Appellant has touched on a due process issue that I think is worthy of the Court's attention in an appropriate case. Mississippi law gives juries discretion to award any amount of punitive damages in any tort case in which a defendant acts with a certain mental state. In my view, because of the punitive character of such awards, there is reason to think that this may violate the Due Process Clause.

Punitive damages are not measured against actual injury, so there is no objective standard that limits their amount. Hence, "the impact of these windfall recoveries is unpredictable and potentially substantial." (citation omitted). For these reasons, the Court has forbidden the award of punitive damages in defamation suits brought by private plaintiffs ... and in unfair representation suits brought against unions under

the Railway Labor Act. (citations omitted). For similar reasons, the Court should scrutinize carefully the procedures under which punitive damages are awarded in civil lawsuits.

486 U.S. at 87–88, 108 S.Ct. at 1655–56.

In *Browning–Ferris Indus. v. Kelco Disposal,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), Justice Brennan, in his concurrence, expressed concern about punitive damages procedures and stated:

Without statutory (or at least common-law) standards for the determination of how large an award of punitive damages is appropriate in a given case, juries are left largely to themselves in making this important, and potentially devastating, decision. Indeed, the jury in this case was sent to the jury room with nothing more than the following terse instruction: "In determining the amount of punitive damages, ... you may take into account the character of the defendants, their financial standing, and the nature of their acts." App. 81. Guidance like this is scarcely better than no guidance at all. I do not suggest that the instruction itself was in error; indeed, it appears to have been a correct statement of Vermont law. The point is, rather, that the instruction reveals a deeper flaw: the fact that punitive damages are imposed by juries guided by little more than an admonition to do what they think is best.

*Id.* at 280, 109 S.Ct. at 2923

Punitive damages may be excessive and akin to a criminal punishment, especially when compared with criminal fines. If a civil defendant is to be exposed to such "criminal liability," the defendant should be entitled to criminal procedural protections: (1) a "beyond a reasonable doubt" burden of proof; (2) a unanimous jury; (3) an upper limit on the punishment; and (4) bifurcation of the liability and punitive damages portions of the trial.

Aside from my belief that punitive damages have no place in modern tort law, two other issues at trial require a reversal in this case: the trial court's refusal to allow the testimony of proposed expert witness Mike Breen, and the failure of the jury instructions to mirror the relevant punitive damages statute.

## II. TRIAL COURT ERRED IN EXCLUDING APPELLANT'S EXPERT WITNESS.

Breen is a Bowling Green attorney whom Appellants offered at trial as an expert witness on various bad faith issues. The trial court ruled that Breen was not competent to testify because he did not have sufficient experience in fire litigation. By avowal, it was shown that Breen has been licensed to practice law in Kentucky since 1983, and that his practice consists primarily of plaintiff litigation, concentrating on personal injury and insurance litigation, particularly bad faith issues. At the time of trial, this witness had lectured on six occasions on this topic, practiced several bad faith cases, reviewed numerous bad faith claims, and written a leading treatise on Kentucky bad faith law. *Bad Faith in Kentucky: A Primer.* By avowal, Breen testified that Appellant's interpretation of the policy, its settlement offer, and the basis of that offer were reasonable, and that its response had been timely.

Appellants rightfully argue that Breen need not be an expert in fire litigation to be qualified as a bad faith expert, which encompasses a range of litigation topics. KRE 702, which governs the admissibility of testimony by experts, reads:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Thus, the test for allowing an expert witness is whether his testimony would assist the trier of fact. This Court held in *Kentucky Power Co. v. Kilbourn,* Ky., 307

S.W.2d 9, 12 (1957), that no precise method of obtaining expertise exists. "A witness may become qualified by practice or an acquaintance with the subject. He may possess the requisite skill by reason of actual experience or long observation."

Jurors would have little reason to know what is evidence of bad faith in the adjustment of insurance claims, and Breen himself in his treatise calls bad faith a general "substantive abstraction at its greatest." Breen at 1. Examples of what would constitute bad faith in various insurance adjusting practices cannot differ so greatly that Breen's testimony would not have at least made the amorphous concept more concrete. His testimony could have aided the trier of fact in putting Appellant's actions in the context of the industry, of which he has studied hundreds of claims. That alone would qualify him as one who obtained his expertise by "long observation."

Breen is not out of line with other expert witnesses this court has upheld. In *Manchester Insurance & Indemnity Co. v. Grundy*, Ky., 531 S.W.2d 493, 501 (1975), although we held that the two attorneys who acted as expert witnesses in a bad faith claim gave irrelevant testimony, we did not say they were unqualified to testify. In *Washington v. Goodman*, Ky.App., 830 S.W.2d 398 (1992), an internist was deemed qualified to testify about the probability and nature of infectious diseases. In *Ford, supra*, a serotologist who identified biological material for size, quantity and quality was allowed to testify to the likelihood that pieces of skin had come from the holes in a particular hand. In that case the appellant admitted that he knew of no one who was a direct expert in matching skin to holes, while the opposition's physician testified that such matching would be impossible because the skin

flecks would shrink, while the holes would enlarge 665 S.W.2d at 309–10. This Court in *Arndell v. Peay*, Ky., 411 S.W.2d 473 (1967), held that a general practitioner could give expert testimony about whether a party had senile dementia based on his observations. We stated, "[I]t has been held that the lack of specialized training by a doctor goes only to weight and not to competency." *Id.* at 475. This rule was expanded beyond doctors to all expert witnesses in *Washington, supra*, at 400.

It is settled in Kentucky that the decision to allow an expert witness is within the discretion of the trial judge. *See Ford v. Commonwealth*, Ky., 665 S.W.2d 304 (1983); *Gentry v. General Motors Corp.*, Ky.App., 839 S.W.2d 576 (1992); *Washington, supra*. Considering past rulings on expert witnesses, the ruling in this case was clearly erroneous and should be reversed.

In this case, the trial court abused its discretion by not allowing Breen's testimony. Although he had little expertise on fire litigation, he had a well-grounded knowledge of bad-faith claims against insurance companies. His lack of fire experience should go only to weight and he should have been allowed to testify.

## III. JURY INSTRUCTIONS SHOULD HAVE MIRRORED APPLICABLE STATUTE.

Appellant argues that the trial court erroneously failed to give an instruction on punitive damages which mirrored KRS 411.184, the punitive damages statute. Our opinion in *Williams v. Wilson*, Ky., 972 S.W.2d 260 (1998), declared KRS 411.184(1)(c) [1] unconstitutional, but stated that the constitutionality of KRS 411.184(2) was not properly before this Court on appeal. Appellant's objection to the instruction related to KRS 411.184(2) [2].

1. " 'Malice' means either conduct which is specifically intended by the defendant to cause tangible or intangible injury to the plaintiff or conduct that is carried out by the defendant both with a flagrant indifference to

the rights of the plaintiff and with a subjective awareness that such conduct will result in death or bodily harm." KRS 411.184(1)(c)

2. "A plaintiff shall recover punitive damages only upon proving, by clear and convincing

In its instructions, the trial court used a three-part test enumerated in Justice Leibson's dissent in *Federal Kemper Insurance Co. v. Hornback*, Ky., 711 S.W.2d 844, 846 (1986), which was accepted as the state of the law in *Curry v. Fireman's Fund Insurance Co.*, Ky., 784 S.W.2d 176 (1989).[3] The trial court also instructed the jury using KRS 411.184(f), which defines punitive damages, and KRS 411.186(2), which lists the appropriate factors to consider in determining the amount of punitive damages.

The trial court's error lies in the belief that it can choose which portions of the statute to use in jury instructions. The trial court and Court of Appeals rely on Justice Leibson's statement in *Federal Kemper, supra*, where he noted that this test was the equivalent of that for punitive damages that was described in *Feathers v. State Farm Fire and Casualty Co.*, Ky. App., 667 S.W.2d 693 (1983), *overruled by Federal Kemper, supra*. Appellees also claim that the scienter requirement described by KRS 411.184(2) is incorporated into parts two and three of the three-part test. Both of these arguments fail for two reasons.

First, this Court in *Williams, supra*, stated, "[W]here statutes are applicable, trial courts must instruct in statutory language." *Id.* at 264. *See also Sorg v. Purvis*, Ky., 487 S.W.2d 943 (1972), and *McCulloch's Adm'r v. Abell's Adm'r*, 272 Ky. 756, 115 S.W.2d 386, 390 (1938) ("Where the statute speaks in no uncertain terms, it hardly can be said that the use in an instruction of other terms not meaning substantially the same thing is not prejudicial error.") Because it is imperative to instruct the jury in the exact language of applicable statutes, this Court found KRS

411.184(1)(c) unconstitutional. We stated, "We are unimpressed by the argument that the statute could be 'loosely interpreted'.... It would be the height of duplicity to at once uphold the constitutionality of a statute and declare that it not be literally observed." *Williams, supra* at 264.

Second, in considering the timing of the cited cases and the statute's enactment, the statute controls. KRS 411.184 was enacted after *Feathers, supra*, between *Federal Kemper, supra*, and *Curry, supra*, and before *Williams, supra*. The statute provides in KRS 411.184(5). "This statute is applicable to all cases in which punitive damages are sought and supersedes any and all existing statutory or judicial law insofar as such law is inconsistent with the provisions of this statute." Because of its timing, this statute would supersede *Feathers, supra*, and *Federal Kemper, supra*, in as much as *Federal Kemper, supra*, noted that the enumerated three-part test for bad faith is the equivalent of the test for punitive damages in *Feathers, supra*.

Appellees argue that if the Court had meant for the statute to control jury instructions, it would have said so in *Curry, supra*, or *Wittmer, supra*, both of which were decided after the statute's enactment. However, nothing in *Curry, supra*, which simply incorporated the dissent in *Federal Kemper, supra*, is inconsistent with the statute. Furthermore, in considering Justice Leibson's statement in *Federal Kemper* about the similarity to the three-prong test of bad faith and the punitive damages considerations in *Feathers, supra*, the lower courts' holdings are not persuasive. On the issue of punitive damages, the Court of Appeals in *Feathers, supra*, only stated, "if State Farm was not justified in its actions then its conduct was tortious against the

---

evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." KRS 411.184(2)

**3.** These factors are:
1. The insurer must be obligated to pay the claim under the terms of the policy.
2. The insurer must lack a reasonable basis in law or in fact for denying claim.
3. It must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

policyholder for which consequential and punitive damages *may* be presented to the factfinder." *Id.* at 697. (emphasis added). This statement suggests not that the finding of bad faith is the direct equivalent of finding of the appropriateness of punitive damages, but that the finding of bad faith opens the door for consideration of punitive damages. None of that trumps a statute which this court has not found to be unconstitutional. In *Wittmer, supra,* this Court only addressed its fear that the statute would infringe upon jural rights. We acted on that fear five years later, by holding the statute partially unconstitutional, but at no time did that affect the consideration to be given to KRS 411.184(2) in formulating jury instructions.

For the above reasons, I would reverse.

COOPER, J., joins this dissent only as to Part II and Part III.