**HISCOX DEDICATED CORPORATE MEMBER LTD., On Its Own Behalf And For And On Behalf Of Underwriting Syndicates 33, 2591 and 40 at Lloyd's, London, England Plaintiff**

v.

**Ralph C. WILSON, Jr. Defendant**

**No. CIV.A. 01–416–KF.**

United States District Court, E.D. Kentucky.

Jan. 28, 2003.

Palmer G. Vance, II, William T. Bishop, III, Stoll, Keenon & Park, LLP, Lexington, KY, Harvey A. Feintuch, London Fischer LLP, New York, NY, for Hiscox Dedicated Corporate Member, Ltd., on its own behalf and for and on behalf of— Underwriting Syndicates 33, 2591 and 40 at Lloyds, London England, plaintiff.

Pamela J. Ledford, Grover C. Potts, Jr., Wyatt, Tarrant & Combs, Louisville, KY, Eugene Driker, Jeffrey B. Linden, Barris, Sott, Denn & Driker PLLC, Detroit, MI, for Ralph C. Wilson, Jr., defendant.

## OPINION & ORDER

FORESTER, Chief Judge.

This matter is before the Court upon the following motions: defendant's motion for partial summary judgment [DE # 98];

plaintiff's motion for summary judgment on defendant's counterclaims [DE # 99]; plaintiff's motion for summary judgment on its fourth cause of action [DE # 100]; plaintiff's motion to compel deposition of expert Mike Breen [DE # 128]; defendant's motions in limine [DE # 130–134]; defendant's objections to plaintiff's exhibits [DE # 136]; and defendant's motion to exclude testimony of plaintiff's expert Orsini [DE # 137].

## I. FACTUAL BACKGROUND

Wilson, as Trustee of the Ralph C. Wilson, Jr. Revocable Trust, is the owner and a named insured on Lloyd's Policy No. 483/H119752 insuring against the humane destruction of the unnamed 1999 bay colt out of the mare Lonely Girl by the thoroughbred stallion Unbridled owned by the Trust. Underwriters are subscribers to and participants in the Policy and are bound and liable under the policy for payments due thereunder, i.e., the colt's agreed value of $875,000, subject to certain condition precedents set forth in the policy.

Wilson is an experienced entrepreneur with diverse business holdings, including highway construction, radio stations, trucking, the thoroughbred horse industry, ownership of the Buffalo Bills, and previous ownership of an insurance brokerage firm. He purchased the subject colt at a Keeneland yearling sale in Lexington, Kentucky, on September, 2000. Shortly thereafter, the colt was added by endorsement as a covered horse under the policy and insured for the sum of $875,000. The colt was boarded and cared for at Saxony Farms, owned by Bruce Hundley, and located near Versailles, Kentucky.

On January 9, 2001, the colt was observed by Saxony Farm staff to have swelling in the right hind portion of the right rear leg. The colt was immediately examined by Dr. Louis Johnson, the farm's licensed resident veterinarian. After a brief period of observation and treatment with anti-inflammatory agents, Dr. Johnson determined by x-ray examination that the colt had suffered a fracture in the right hind hock from causes unknown. Dr. Johnson then consulted with equine surgeons at Rood and Riddle Equine Hospital in Lexington concerning the colt's condition and treatment options. The surgeons recommended surgery for the colt on January 22, 2001, to be conducted by Dr. Larry Bramlage, regarded as one of the most esteemed equine surgeons in the country.

On January 10, 2001, the same day the x-rays of the colt's hock were taken and developed, Bruce Hundley's office at Saxony Farm provided written notice of a fracture-type injury requiring surgery to the Lloyd's London broker by facsimile, and through them, promptly to the Underwriters within a day. Specifically, the notice stated:

> [T]he unnamed 1999 bay colt out of the mare Lonely Girl by Unbridled, owned by Mr. Ralph C. Wilson, Jr., is scheduled to have arthroscopic surgery to remove a chip in his hock in about one week. The surgery will be performed by Dr. Bramlage at Rood & Riddle Equestrian Hospital in Lexington, Kentucky. You may contact our office should you need additional information.

Underwriters issued an acknowledgment of receiving the above notice on January 11, 2001. This acknowledgment was sent by Underwriters to Jeffrey Littman, Wilson's chief financial officer and agent.

After the January 22, 2001 arthroscopic surgery on the colt, it was discharged from the hospital on January 24 with instructions to Saxony Farm staff for post-operative care. Upon the colt's return to Saxony Farm, it was observed by Dr. Johnson

and farm staff on a daily basis. On or about January 31, 2001, Dr. Johnson observed some serum discharge from the colt's surgical incision. At this time, he administered antibiotics as a precaution. On February 6, 2001, the day after the sutures were removed, Dr. Johnson observed signs of infection in the horse for the first time. After consulting with Dr. Bramlage, and after performing a joint arthrocentesis, on February 7, 2001, Johnson observed that the fluid obtained from the joint appeared infected. The colt was re-hospitalized, and tests confirmed that a staph infection had developed in the hock joint.

At the hospital, the colt underwent four arthrosenteses; arthroscopic debridement to remove the fibrin and bacteria from the joint; six injections of two different antibiotics into the joint; daily administration of additional antibiotics orally for systemic treatment; flushing of the joint to cleanse it of bacteria approximately eleven times; and the administration of anti-inflammatory medications in an attempt to control the infection.

After the above treatment at the hospital, the colt was returned to the farm with instructions for farm staff to continue treatment with oral antibiotics and anti-inflammatory medicines. Due to the fact that the colt exhibited signs of waxing and waning lameness, Dr. Johnson took two more samples of the joint fluid on February 22, 2001 and February 25, 2001 and sent them to the hospital for analysis. Johnson also performed another joint lavage to cleanse the infected joint on February 25, 2001. When the cultures revealed that the infection was still present, Johnson again consulted with the hospital concerning altering treatment of the colt, but continued treatment with the antibiotic Chloramphenicol.

From the end of February until late March 2001, defendants maintain that the colt continued to receive daily care and treatment from Dr. Johnson and the farm staff. During this time, Johnson also administered Rifampin, another antibiotic, to the colt. Despite the above described treatment, the infection did not resolve. On March 30, 2001 Dr. Johnson and farm staff spoke with Richard J. Ketch, the Underwriters' agent and adjuster, to obtain permission to euthanize the colt. Johnson's decision was based on the fact that the horse was suffering, was chronically lame, and continued to lose weight.

Ketch was timely notified by facsimile, prior to euthanization, that the colt was required and scheduled to be euthanized for humane reasons the following day, March 31, 2001. On the same day, Ketch sent written confirmation to Saxony Farm confirming a telephone conversation between Ketch and Dr. Johnson concerning the colt and Underwriters' agreement and consent without reservation to the recommendation that the colt be euthanized for humane reasons. The colt was humanely euthanized on March 31, 2001, in accordance with Underwriters' express prior consent.

The policy insuring the colt contained a "Surgical Operations Extension Clause" providing:

> ***Subject to all of the terms, conditions and exclusions of the Policy to which this clause is attached,*** the Underwriters hereon agree that any extension which may be required by the INSURED in respect of surgical operations upon the HORSES Insured hereunder will be insured without payment of any Additional Premium, provided that:
>
> 1. All surgical operations, other than in an attempt to save the HORSE'S life, are advised to the Underwrit-

ers hereon prior to the operations being performed.

All surgical operations are to be performed by a qualified VETERINARIAN.

(emphasis added).

Pursuant to the above provision, notice of the surgical procedure was provided to Underwriters on or about January 11, 2001. After presenting the fax to the Underwriters, Karen Curling, an employee of Nelson Steavenson, Wilson's London Insurance Broker, sent a facsimile message to Littman, Wilson's representative, noting the January 10, 2001 facsimile letter and requesting that Littman advise of "any adverse developments" from the contemplated surgical procedure.

It is undisputed that the next communication from Wilson to Underwriters did not occur until March 30, 2001, when Ketch, Underwriters' adjuster, received a call from Rebecca Woloch of Saxony Farm, advising that the colt needed to be humanely destroyed. Woloch advised Ketch that surgery had been performed on the colt, that it had developed an infection, and that these matters had previously been reported to London. Ketch then spoke to Dr. Johnson, and based upon Johnson's report of the horse's suffering, agreed to the euthanization. That same day, Ketch sent a facsimile to Steavenson in London advising of his agreement to the humane destruction and remarking "trust you are aware of the history." Julian Lloyd, the lead Underwriter, received the fax on April 2, 2001, the following Monday. Lloyd states that he was unaware of any history pertaining to the colt, since the only communication received was the January 10, 2001 facsimile concerning surgery for a "chip in the hock."

After receiving word of the colt's destruction, Lloyd initiated an investigation to determine what had happened to the colt between January 10 and March 30, 2001, before any decision could be made on Wilson's claim for the colt's loss. The parties dispute the severity of the colt's fracture; however, it is undisputed that the Underwriters were not informed of the colt's infection and lameness which Wilson was aware of as early as February 6. In addition, the Underwriters were not informed of the ensuing treatment for the infection. The plaintiff maintains that the failure to provide notice of the infection and lameness violates a condition precedent to the policy attached to the surgical operations extension clause. The condition precedent provides:

It is a condition precedent to any liability of the Underwriters that:

(a) in the event of any *illness, disease, lameness, injury, accident or physical disability whatsoever of or to the HORSE,* the INSURED shall immediately at his own expense employ a VETERINARIAN and shall, if required by the Underwriters, allow removal of the HORSE for treatment; and

(b) in the event of the death or HUMANE DESTRUCTION of the HORSE, the INSURED shall immediately at his own expense arrange for a POST–MORTEM to be done by a VETERINARIAN to establish the cause of death and submit a copy of the report to the Underwriters as soon as possible after the death or HUMANE DESTRUCTION of the HORSE; and

(c) *in the event of either 7a) or b), the INSURED shall immediately give notice by telephone or telecopy to the person or persons specified for the purpose in the Schedule,* who will instruct a VETERINARIAN on the Underwriters' behalf, if deemed necessary;

(emphasis added).

## II. ANALYSIS

### A. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The evidence, all facts, and any inferences that may be permissibly drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir.1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lob-*

*by, Inc.*, 477 U.S. at 252, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted). Based upon these principles, plaintiff is entitled to summary judgment.

### B. Plaintiffs' Motion for Summary Judgment

■ The Surgical Operations Extension Clause unambiguously requires notice in the event of any illness, disease, lameness, injury, accident or physical disability to the horse. As stated above, the Clause provides:

> *Subject to all of the terms, conditions and exclusions of the Policy to which this clause is attached*, the Underwriters hereon agree that any extension which may be required by the INSURED in respect of surgical operations upon the HORSES Insured hereunder will be insured without payment of any Additional Premium, provided that:
>
> 1. All surgical operations, other than in an attempt to save the HORSE'S life, are advised to the Underwriters hereon prior to the operations being performed.
>
> All surgical operations are to be performed by a qualified VETERINARIAN.

(emphasis added).

Attached to the Surgical Operations Extension Clause is Condition 7, an unambiguous condition precedent to coverage, stating:

> It is a condition precedent to any liability of the Underwriters that:
>
> (a) in the event of any *illness, disease, lameness, injury, accident or physical disability whatsoever of or to the HORSE*, the INSURED shall im-

mediately at his own expense employ a VETERINARIAN and shall, if required by the Underwriters, allow removal of the HORSE for treatment; and

(b) in the event of the death or HUMANE DESTRUCTION of the HORSE, the INSURED shall immediately at his own expense arrange for a POST–MORTEM to be done by a VETERINARIAN to establish the cause of death and submit a copy of the report to the Underwriters as soon as possible after the death or HUMANE DESTRUCTION of the HORSE; and

(c) *in the event of either 7a) or b), the INSURED shall immediately give notice by telephone or telecopy to the person or persons specified for the purpose in the Schedule,* who will instruct a VETERINARIAN on the Underwriters' behalf, if deemed necessary;

(emphasis added).

It is undisputed that the infection the horse developed from the January 22, 2001, surgery constitutes "illness, disease, lameness, injury, accident or physical disability" within the meaning of the above condition precedent. It is likewise undisputed that Wilson failed to provide "immediate" notice of the infection by delaying notice to Ketch, the Underwriters' adjuster, for weeks, finally contacting him just one day before the recommended humane destruction of the colt.[1]

The condition precedent makes clear that immediate notice "is a condition precedent to any liability of the Underwriters." Moreover, the contract of insurance contains an "IMPORTANT NOTE" section, providing:

Any breach of any of the Conditions 1 through 12 [obviously, including condi-

tion 7] …whether the INSURED has personal knowledge of such circumstances or events or such knowledge is confined to his family, representatives, agents, employees, bailees or other persons who have care, custody or control of the HORSE shall render the INSURED'S claim null and void and release the Underwriters from all liability.

Contract of Insurance, p. 10.

Accordingly, Wilson's lack of personal knowledge that the horse developed an infection does not excuse the failure of the condition precedent. It is undisputed that Wilson's "representatives, agents, employees, and bailees or other persons who ha[d] care, custody or control of the horse" *i.e.,* Saxony Farm, had knowledge of the infection weeks before the horse had to be destroyed.

Wilson argues that the January 10, 2001, notice that the horse was to have surgery for a "chip in its hock" was sufficient notice of the infection resulting from that surgery. Wilson's construction is unreasonable on its face in that the notice provisions in the policy are clearly separate provisions; notice given for a surgical procedure does not alleviate the notice requirement for illness, disease, lameness, injury, accident, or physical disability. To the contrary, the provision requiring notice of the surgery is expressly subject to the condition precedent requiring notice of illness, disease, lameness, injury, accident, or physical disability. Therefore, without an ambiguity concerning the separate notice requirements of the Surgical Operations Extension Clause and the condition precedent notice requirement, the Kentucky doctrine of "reasonable expectations of the

---

1. Ketch was expressly named in the Schedule of Underwriters' Contract of Insurance as the party to be notified immediately for purposes of condition precedent 7(c). *See* Contract of Insurance, p. 3.

insured" is not at issue.[2] *See, e.g., Swartz v. Metropolitan Property & Casualty Company,* 949 S.W.2d 72, 76 (Ky.App. 1997); *Consolidated American Ins. Co. v. Anderson,* 964 S.W.2d 811 (Ky.Ct.App. 1997). The condition precedent of immediate notice was clearly not met, and pursuant to the terms of the policy, coverage is null and void. *See, e.g., Hartford Live Stock Ins. Co. v. Henning,* 206 Ky. 9, 266 S.W. 912 (1924); *Underwriters at Lloyds, London v. Harkins,* 427 S.W.2d 659, 664 (Tex.Civ.App.1968) ("Only through immediate notice can the insurer protect itself from the unusual hazards that accompany the insuring of animal life, as contrasted to the insuring of human life.").

In addition, evidence in the record fully supports the practical rationale behind the policy provision requiring notice when an infection develops, separate and in addition to the notice required for the chip removal surgery. The Underwriters do not monitor every chip removal, a routine procedure "done hundreds, if not thousands of times in central Kentucky alone each year." It is undisputed that loss adjusters are appointed only when there is a loss or a likelihood of potential loss, and that arthroscopic procedures for chip removals do not present a loss or likelihood for potential loss. It is likewise undisputed that, in contrast, post operative infections do not occur with any regularity, but do present a likelihood of potential loss when present.

Due to the unambiguous policy, it is unnecessary to resort to course of dealing evidence to construe the notice provisions. Regardless, Wilson's stated understanding of the notice provisions and previous conduct under substantially similar circumstances only confirm the Court's view of the notice requirements. Jeffery Littman, an attorney who serves as CFO of Ralph C. Wilson, Jr. Enterprises, has managed Wilson's insurance on horses for at least the past five years. Littman acknowledges his understanding that the policy was subject to the condition precedent requiring notice in the event of illness, lameness, accident, or physical disability to the horse. Moreover, in a 1999 potential claim involving non-life threatening surgery to the horse "Remember Ike," also insured by Underwriters, Littman provided both notice of the surgery, *and* notice of complications arising from that surgery. Remember Ike was injured in a flight to Texas, and Littman provided notice by facsimile on May 6, 1999, that surgery was to be performed on the horse the following day. On May 19, 1999, Littman sent a second facsimile immediately alerting Underwriters that Remember Ike had encountered complications from the surgery—oozing at the surgical site, *i.e.,* an infection.[3]

■ Wilson relies upon *Horton v. American Home Assurance Co.,* 245 So.2d 136 (Fla.Dist.Ct.App.1971), to argue

**2.** The contents of the notice required pursuant to the separate notice provisions are not at issue for purposes of the Court's ruling because it is undisputed that Wilson failed to provide **any** form of notice concerning the infection developed after the January 10, 2001 notice of the operation. This utter lack of any attempt to provide notice of the infection dispels the argument of "substantial compliance" with the condition precedent requiring notice of the infection. Likewise, there is no issue of which provision is "general" or "specific" because the separate duties to provide

notice arise in discrete, clearly defined circumstances that are not reasonably in dispute.

**3.** Wilson has not objected to this evidence on relevancy grounds, and the Court otherwise finds the circumstances surrounding the notice provided for Remember Ike's surgery and resulting complications to be substantially similar in material respects to the notice dispute.

that the Underwriters, through its adjuster Ketch, waived the notice requirement for the infection by consenting to the humane destruction of the horse without reservation. This argument is not well-taken because *Horton* involved an insurance company providing consent to the humane destruction of a horse while the policy was in place, and then attempting to deny coverage after the policy expired six months later due to the horse owner's postponing destruction in an unsuccessful attempt to save the horse's life. Moreover, unlike here, the insured in *Horton* complied with all the conditions of the policy.

■ Wilson maintains that even if he failed to comply with the provision requiring notice as a condition precedent to coverage, Kentucky law "has held, without limitation, that insurers must demonstrate probable prejudice to avoid coverage for lack of notice." Wilson's reliance upon *Jones v. Bituminous Cas. Corp.*, 821 S.W.2d 798 (Ky.1991), is misplaced in that the Kentucky Supreme Court's actual holding does not fairly extend to the facts of this case. *Jones* framed the issue: "[t]he time has come for Kentucky to reconsider whether failure to provide prompt notice should automatically defeat *liability* insurance coverage regardless of circumstances." *Jones*, 821 S.W.2d at 801 (emphasis added). *Jones* overturned the traditional rule represented by *Reserve Ins. Co. v. Richards*, 577 S.W.2d 417, 419 (Ky. 1978), that "[c]ompliance with the notice provisions of an insurance policy is a condition precedent to recovery on the policy." Thus, as a textual matter, *Jones* addresses only liability insurance (third party) and not the first-party equine property insurance at issue. Similarly, the traditional rule represented by *Richards* and overturned in *Jones* was the default *court construction* of a notice provision in an insur-

ance policy as a condition precedent. In contrast, the policy at issue, unlike in *Richards*, clearly provides that notice is a condition precedent to coverage.

The reasons expressed in *Jones* for overturning the traditional default prejudice presumption confirm the above textual limitations on the Kentucky Supreme Court's holding. As an initial matter, *Jones* presented a contract of adhesion—a standard form insurance policy lacking "language in the contract clearly spelling out the meaning and parameters of prompt notice and automatic forfeiture consequences ..." *Jones*, 821 S.W.2d at 801–02. Here, the precise degree of negotiation and ability to negotiate are disputed; however, Wilson retained at least some bargaining power as his London agent was actually able to negotiate the insertion of the Surgical Operations Extension Clause. Regardless, the automatic forfeiture provisions are clearly stated in the policy. Likewise, *Jones'* second rationale regarding the doctrine of reasonable expectations is not at issue here, again due to the clear warning of forfeiture and the clarity of the two separate notice provisions. *Id.*

The primary rationale behind *Jones* emphasizes that the insured "purchased this policy of public liability insurance because *it was required by law in order to obtain a mining permit for the benefit of those who would be exposed to the risk involved by the mining operations.*" *Id.* (emphasis added). This rationale emphasizes the special duty of the Court to police the terms of the contract in that case, since the liability coverage was required by law as a matter of public policy. *Id.* ("The insurance was required by administrative regulations enacted pursuant to statute, and as such a declaration of public policy."). In contrast, Kentucky law did not require Wilson to purchase the property insurance and there is no third party ex-

posed to risk by Wilson's ownership of the horse. Consequently, the public policy concerns of protecting third party exposure to risk are not present in this first party context, and the Court is not compelled to rewrite the terms of the parties' bargain.[4]

The question of whether *Jones* extends to the first party context, more specifically to the specialized context of equine insurance, is apparently a matter of first impression under Kentucky law. This diversity court is presented with the admittedly difficult task of predicting how the Kentucky Supreme Court would apply its general provisions regarding the effect of late notice represented by *Jones* to this specialized equine context. A New Jersey appeals court was presented with the almost identical question of whether, in the event the insured provides late notice, to extend its proof of prejudice requirement derived from general liability insurance to the specialized equine insurance context. *See Arigato Stables v. American Live Stock Ins. Co.*, 201 N.J.Super. 492, 493 A.2d 584 (1985). New Jersey had previously abandoned the automatic forfeiture of coverage rule in the event of late notice. *See Cooper v. Government Employees Insurance Company*, 51 N.J. 86, 237 A.2d 870 (1968). *Arigato*, in the context of a virtually identical condition precedent rendering coverage null and void without the required notice, reasoned:

> We are satisfied that this policy … is specially tailored to the peculiar circumstances of the thoroughbred breeding

business and that the court should not rewrite the terms of the contract for the parties. We are not dealing with a contract that will affect the rights of third parties who have liability claims as in Cooper. It is clear that the conditions set forth in the policy serve a necessary and useful purpose with respect to the risk assumed by the insurer.

*Arigato*, 493 A.2d. at 585.

The peculiar circumstances of the thoroughbred industry, as opposed to the third party liability insurance context, require immediate notice of potential claims. As explained by *Arigato:*

> Only through immediate notice can the insurer investigate the causes of illness or death that are certainly unique to livestock policies. Only through immediate notice can the insurer know, or have an opportunity to know, that the animal will receive proper attention and treatment. Only through immediate notice can the insurer protect itself from the unusual hazards that accompany the insuring of animal life, as contrasted to the insuring of human life.

*Arigato*, 493 A.2d at 586 (citing *Underwriters at Lloyds, London v. Harkins*, 427 S.W.2d 659 (Tex.Civ.App.1968)).

In light of the above reasoning and the primary rationale of *Jones*, namely, protecting third parties in the public liability context, this Court predicts that the Kentucky Supreme Court would continue to strictly enforce the condition precedent of immediate notice in the limited context of equine insurance.[5] This prediction is fur-

---

4. The final rationale of *Jones*, that of "premiums" is fact-specific to the policy at issue in that case and likewise not controlling here. According to *Jones*, "[b]y adopting a rule requiring proof of prejudice from a delay in notification, all the insurance company is being required to do is to take the risk it was paid to take rather than escape liability for coverage otherwise provided." *Id.* at 802–03.

Here, coverage was not "otherwise provided" because the explicit condition precedent to coverage was not met.

5. The Court acknowledges that reasonable minds may differ concerning whether to extend the general prejudice requirement to the equine policy context. *See Wolfson v. Ins. Co. of Florida*, 451 So.2d 1005, 1006–07 (Fla.App.

ther buttressed as a policy matter by the importance of the thoroughbred horse industry to the Commonwealth, and the specialized knowledge of those involved in the industry of the unique insurance risks presented. Accordingly, the plaintiffs are entitled to summary judgment.

## C. Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims

Wilson asserts counterclaims for bad faith pursuant to Kentucky common law, Kentucky's Uniform Claims Settlement Practices Act as set forth in KRS 304.12–230, and KAR 12.095 § 4(4).

 Common law bad faith in Kentucky requires the claimant to establish the following elements: the insurer is obligated to pay the claim under the terms of the policy; the insurer lacks a reasonable basis in law or fact for denying the claim; and the insurer either knew that there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed. *Wittmer v. Jones,* 864 S.W.2d 885, 890 (Ky.1993) (quoting *Federal Kemper Ins. Co. v. Hornback,* 711 S.W.2d 844, (Ky.1986) ( Leibson, J., dissenting)). Pursuant to the above analysis granting the plaintiff's motion for summary judgement, Wilson fails to set forth affirmative evidence to defeat the motion for summary judgment on any of the three required elements. There is no evidence of conscious wrongdoing or recklessness on the part of the Underwriters and summary judgment is appropriate. *See Matt v. Liberty Mutual Ins. Co.,* 798 F.Supp. 429 (W.D.Ky.1991); *Sculimbrene v. Paul*

*Revere Ins. Co.,* 925 F.Supp. 505 (E.D.Ky. 1996); *Allstate Ins. Co. v. Coffey,* 796 F.Supp. 1017 (E.D.Ky.1992).

 Turning to Wilson's statutory claim, despite the Court's ruling that the policy precluded coverage, thereby rendering the claim "fairly debatable" as a matter of law, the insurer is still required under Kentucky law to debate the matter fairly. *See Farmland Mut. Ins. Co. v. Johnson,* 36 S.W.3d 368, 376 (Ky.2000). The thorough investigation conducted by the Underwriters before denying the claim forecloses Wilson's argument that his evidence was not given equal consideration. Wilson was kept informed throughout the process of the investigation. Wilson was not forced to enter into the non-waiver agreement in order to allow the Underwriters additional time to investigate his claims because the Underwriters had sufficient information to deny the claim before Wilson entered into the agreement. In fact, a May 15, 2001, letter from Underwriters' counsel revealed to Wilson that his omission to advise of "lameness, injury, accident or physical disability" failed to satisfy the condition precedent notice provision.

Moreover, Wilson has failed to establish more than a scintilla of evidence that the procedures utilized by the Underwriters in the investigation constitute an unfair claims settlement practice. The Underwriters had the contractual right to conduct examinations under oath in the claim investigation, and the exercise of this right is not bad faith. Wilson's allegations concerning attorney Feintuch's handling of the investigation are not well-taken. Wil-

1984), *pet. for rev. den.* 458 So.2d 272 (Fla. 1984) (carrying over to the equine policy context the general provisions of Florida insurance law requiring that an insurer show prejudice before denying a claim based on noncompliance with the notice provision). *Com-*

*pare Wolfson,* 451 So.2d at 1008 (Baskin, J., dissenting) (expressing the minimal burden upon the insured of notifying the insurer either by phone call or letter, in light of the potential for escalating rates for livestock mortality insurance).

son did not file a motion to compel in response to Feintuch's assertion of privilege, and a discovery dispute or strategy by attorneys during litigation, particularly when only brought to the Court's attention after the close of discovery, does not rise to the level of an unfair claims settlement practice. *Cf. Graham v. Gallant Ins. Group*, 60 F.Supp.2d 632, 635 (W.D.Ky. 1999) (regarding traditional litigation tactics inadmissible as irrelevant to the claimant's bad faith charge). Likewise, the Sixth Circuit has determined that the absence of written adjustment guidelines does not violate the UCSPA when the adjuster in question has experience comparable to that of Julian Lloyd, the lead adjuster in this case. *See Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 587 (6th Cir.2001).

█ Finally, Wilson's claim pursuant to 806 KAR 12.095 § 4(4) is not legally cognizable according to the language of the regulation: "This administrative regulation shall not create or imply a private cause of action for violation of this administrative regulation."

## D. Remaining Motions

In light of the Court's decision to grant the plaintiff's motion for summary judgment, these motions shall be denied as moot.

## III. CONCLUSION

Based upon the foregoing, the Court, being fully advised, HEREBY ORDERS

(1) plaintiff's motion for summary judgment on its fourth cause of action in its complaint for declaratory judgment [DE # 100] is GRANTED;

(2) plaintiff's motion for summary judgment on defendant's counterclaims [DE # 99] is GRANTED;

(3) defendant's motion for partial summary judgment [DE # 98] is DENIED AS MOOT;

(4) plaintiff's motion to compel deposition [DE # 128] is DENIED AS MOOT;

(5) defendant's motions in limine [DE # 130–134] are DENIED AS MOOT;

(6) defendant's motion to exclude testimony of plaintiff's expert Orsini [DE # 137] is DENIED AS MOOT.

(7) the trial scheduled for March 4, 2003, is SET ASIDE.

### SUMMARY JUDGMENT

In accordance with the Opinion and Order entered contemporaneously with this summary judgment, the Court HEREBY ORDERS and ADJUDGES that:

(1) Summary judgment is entered in favor of plaintiff on the fourth cause of action. The Court hereby DECLARES and DECREES that the claim of defendant Wilson against Underwriters for the loss of the subject colt is null and void and Underwriters are released from all liability in connection with the loss of the subject colt;

(2) Summary judgment is entered in favor of plaintiff on defendant's counterclaims;

(3) Defendant's motion for summary judgment is DENIED as moot;

(4) This judgment is final and appealable and no just cause for delay exists;

(5) This matter is STRICKEN from the active docket.