GILMAN, J., delivered the opinion of the court in which CLAY, J., joined. BATCHELDER, C.J. (pp. 735-38), delivered a separate dissenting opinion.
OPINION
RONALD LEE GILMAN, Circuit Judge.
Cynthia Phelps alleges that State Farm Mutual Automobile Insurance Company violated Kentucky’s Unfair Claims Settlement Practices Act (UCSPA) in its processing of her third-party insurance claim. The district court granted summary judgment in favor of State Farm on the ground that Phelps had failed to present sufficient evidence to show that the three years taken to settle her claim raised a genuine dispute as to whether State Farm had acted in bad faith. For the reasons set forth below, we REVERSE the judgment of the district court and REMAND the ease for further proceedings consistent with this opinion.
I. BACKGROUND
This case arises out of an automobile accident that occurred on July 18, 2003. As Phelps was pulling into a gas station in Jefferson County, Kentucky, Lindsey Kirby pulled out of the station in front of Phelps without warning. The two cars collided, causing injuries to Phelps’s spine that ultimately required surgery in October 2003. Kirby was insured by State Farm under an automobile insurance policy with a $50,000 limit of liability. State Farm concedes that Kirby was at fault for the accident and that State Farm was obligated to provide the insurance coverage.
Not long after the accident, Phelps filed a third-party liability claim with State Farm for personal injuries and property damage arising out of the accident. Adjuster Denise Ray was assigned to the claim. Ray sent Phelps a medical-authorization form in September 2003, which Phelps signed and returned that same month. On October 2, 2003, State Farm transferred Phelps’s claim to a second adjuster, Bob Nieses. Nieses sent Phelps’s counsel, Thomas Carroll, a letter requesting a list of Phelps’s medical providers. Nieses received a response within two weeks. He then began collecting Phelps’s medical records.
Phelps’s claim file shows minimal activity until February 11, 2004, when State Farm first noted that Phelps had a prior back injury in 1999 in the same part of her body as the present injury. Nieses determined that additional information was needed to evaluate Phelps’s claim and to separate any prior injuries from the current claim. His file note indicates: “Need to gather information on wage loss, medical bills, and prior condition.” But there is no evidence that Phelps was made aware of State Farm’s need for this information at the time.
Carroll submitted a “settlement package” that was received by State Farm on April 2, 2004. The package included documentation regarding Phelps’s surgery and *728 related medical and wage-loss costs totaling $22,620.22. The package did not include a demand, but it expressed Phelps’s interest in reaching a settlement and made a request for information about State Farm’s policy limits.
State Farm apparently did little to process Phelps’s claim for several months after receiving her settlement package. Nieses testified in his deposition that he did not complete a claim valuation because he considered it “premature” due to the outstanding information about Phelps’s 1999 back injury. In July 2004, State Farm substituted yet another adjuster, Amy Lirely, to process Phelps’s claim. On September 14, 2004, Lirely requested information from Phelps’s attorney about the 1999 injury. State Farm allegedly “received permission to examine PIP [personal injury protection] records” relating to Phelps six days later, but neither party has explained what these records covered.
By October 24, 2004, State Farm had received the medical records relevant to Phelps’s 1999 injury. But State Farm contends that the records it received covered only Phelps’s immediate treatment following the 1999 injury and did not include documentation about her treatment in the years following that injury. Lirely testified that the missing information was relevant to determine how well Phelps had recovered from the 1999 injury by the time of the present accident. Nonetheless, Lirely proceeded to complete a claim evaluation based on the available records, valuing Phelps’s claim between $24,620 and $49,620. Phelps argues that this range was outrageously low given the documentation that State Farm had before it.
State Farm made an initial settlement offer of $25,000 four days later, on October 28, 2004. According to State Farm, its offer did not include compensation for future wage loss or future impairment of earnings because Phelps failed to include any such information in her settlement package. In addition, medical records from December 2003 indicated to State Farm’s adjusters that Phelps had substantially recovered from her July 2008 injury and probably would not experience any future impairments.
Carroll did not directly respond to State Farm’s offer, but Phelps contends that Carroll made additional requests for State Farm to reveal its policy limits over the course of the fall and that Lirely refused to provide this information. Lirely, however, disputes ever being asked about the policy limits. In any event, having heard nothing from Carroll about her offer, Lirely left a phone message for him in January 2005, but the call was not returned.
On March 29, 2005, Lirely finally heard from Carroll, who rejected State Farm’s $25,000 offer and demanded $150,000 to settle the claim. Although State Farm criticizes Carroll for making a demand that far exceeded the policy limits, there is no evidence that Lirely contemporaneously told Carroll that the demand in fact exceeded the policy limits or that Lirely disclosed any information about the policy limits.
Phelps eventually filed suit against Kirby, the driver insured by State Farm, in Kentucky state court in May 2005. In late May and early June, State Farm’s attorney submitted discovery requests to Carroll. Carroll did not respond to these requests until October 25, 2005. State Farm asserts that the discovery produced pertinent new information, including a comprehensive medical-records release and wage-loss documentation. But Phelps contends that the information obtained through discovery was not necessary to the adjudication of her claim and that State Farm had all of the pertinent information that it needed as of April 2, 2004, *729 when it received the settlement package (or, at the very latest, as of October 24, 2004, when it received information about Phelps’s 1999 injury).
On November 3, 2005, State Farm once again replaced Phelps’s claims adjuster, this time assigning the claim to Lillian Jones. Meanwhile, discovery in the pending lawsuit continued through the winter. Phelps was deposed on March 22, 2006. She testified that she had fully recovered from her 1999 injury prior to the 2003 accident. State Farm’s attorney determined that Phelps was a credible witness and recommended that State Farm increase its settlement offer.
Carroll first demanded the policy-limits amount of $50,000 on April 11, 2006. State Farm countered with an offer of $40,000 the following day, which Carroll rejected. Finally, State Farm offered $50,000, the full policy limits, on April 13, 2006. Phelps accepted the offer shortly thereafter, which resolved her pending suit against Kirby.
In May 2007, Phelps filed the present lawsuit, alleging that State Farm had violated Kentucky’s UCSPA through its conduct in processing her claim. The lawsuit originated in state court, but State Farm removed the case to the United States District Court for the Western District of Kentucky based on diversity jurisdiction. Following discovery, State Farm filed a motion for summary judgment. Phelps relied in her response on the testimony of two expert witnesses, Gary Fye and David Huff, concerning the allegedly unreasonable claims-handling practices of State Farm.
In his report, Fye describes himself as a “national claim handling expert,” presently employed as a claim-practices analyst at the Gary T. Fye Company. He has previously worked as a licensed independent analyst and as a claims adjuster or manager for four different insurance companies. His educational background is varied, but largely unrelated to the insurance industry (with the exception of some course work in Business Administration). Fye has also participated in several dozen insurance-related educational programs, given a multitude of presentations, and offered expert testimony in many federal and state court cases.
His report provides background information on the insurance industry and State Farm’s general methods for handling claims, focusing on its financial motivations. With respect to Phelps’s claims, Fye presented the following opinions:
State Farm treated this claim as an opportunity to seek an underpayment by unreasonably making and maintaining a lowball offer to the claimant, whom it considered an adversary. BI [ (Bodily Injury) ] liability coverage is meant to pay the sums owed by Kirby, within the policy limit, without a delay or a trial. It appears State Farm attempted to achieve its own outcome goals by freezing its assessment of the range of value and not moving.
State Farm incorrectly substituted its own subjective and unreasonable value for the claim. State Farm offered what its adjuster felt the beginning point of negotiations should be, but didn’t investigate what a jury might find. It particularly avoided obtaining an Independent Medical Examination (IME) that could only support the claimant’s position with regard to the longer term effects of this type of injury. Knowing that a jury’s determination forms the basis of recovery under this particular coverage, the file should have the facts that support paying the claim, not just facts that suggest not paying it.
This claim became a limit claim on October 15, 2003 when Ms. Phelps had lum *730 bar spine surgery. There was no “new information” in terms of evaluation. State Farm made no attempt to use the policy to soften the financial consequences of the accident for her. It withheld its limit information, and stood on its lowball subjective offer of $25,000 in the face of what amounted to authority for the policy limit. Even when it paid the policy limit, it tried to save $10,000 first. State Farm knew or should have known during this time that it was at risk of extracontractual liabilities for both it and its insured while adopting this stonewall position in non-compliance with Kentucky’s rules for fair claim-handling.
State Farm’s redesigned claim operations and performance-based pay programs undercut Kentucky’s insurance laws and the purpose of BI liability insurance. State Farm is aware of this, yet its programs remain undisclosed to the insuring public both at point of sale and when a claim is reported.
Among the affirmative duties of an insurer is to fulfill the purposes of the coverage. State Farm’s handling of the Phelps case did not provide the level of service the public should expect from an insurer.
Huff, Phelps’s other expert witness, is the CEO of Integrated Risk Management, Inc., a business consulting firm. His background includes positions in the legal and insurance departments of different businesses and in private legal practice. He has received several insurance-related certifications and is a member of numerous professional organizations in the insurance industry. Huff graduated with a bachelor of arts degree from Berea College in Kentucky and a law degree from the University of Kentucky College of Law. His report states: “[I]t is my opinion that State Farm ... acted in bad faith by failing to fulfill its obligation under its insurance policy to pay Cynthia Phelps for her damages and injuries in a reasonable and timely manner and State Farm knew or should have known that it had no reasonable basis in law or fact for such a failure.” He then notes in a bulleted list the facts from the record that he believes supports this conclusion.
The district court granted summary judgment in favor of State Farm without discussing the testimony of either of Phelps’s expert witnesses. It concluded that all reasonable jurors would find that the delay in processing Phelps’s claim was solely attributable to Phelps’s own counsel and to the time reasonably needed for State Farm’s investigation. The court also found that Phelps had failed to prove that an improper purpose — rather than a lack of evidence — drove State Farm’s allegedly low settlement offers. This timely appeal followed.
II. ANALYSIS
A. Standard of review
We review de novo a district court’s grant of summary judgment. ACLU of Ky. v. Grayson Cnty., Ky., 591 F.3d 837, 843 (6th Cir.2010). Summary judgment is proper where no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In considering a motion for summary judgment, we must draw all reasonable inferences in favor of the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is “whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.” Anderson v. Liberty Lobby, Inc., 477 U.S. *731 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
B. Kentucky’s Unfair Claims Settlement Practices Act
Kentucky’s UCSPA is intended “to protect the public from unfair trade practices and fraud,” State Farm Mut. Auto. Ins. Co. v. Reeder, 768 S.W.2d 116, 118 (Ky.1988), and “imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured,” Knotts v. Zurich Ins. Co., 197 S.W.3d 512, 515 (Ky.2006). The UCSPA fundamentally requires that “a good faith attempt be made to effectuate a prompt, fair and equitable settlement.” Motorists Mut. Ins. Co. v. Glass, 996 S.W.2d 437, 454 (Ky.1999); accord Coomer v. Phelps, 172 S.W.3d 389, 395 (Ky.2005). Moreover, the UCSPA “should be liberally construed so as to effectuate its purpose.” Reeder, 763 S.W.2d at 118.
Insurances companies are prohibited by the UCSPA from engaging in 14 specific unfair practices. Ky.Rev.Stat. § 304.12-230. Phelps alleges that State Farm violated the following subsections:
(3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
(4) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
(6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; [and]
(7) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;
Id. § 304.12-230. An insurance company’s violation of the UCSPA creates a private cause of action both for the named insured and for those who have claims against named insureds, and the same standards govern both types of cases. Motorists Mut., 996 S.W.2d at 452; see also King v. Liberty Mut. Ins. Co., 54 Fed.Appx. 833, 836 (6th Cir.2003).
In order to state a claim under the UCSPA, Phelps must meet a high threshold standard that requires evidence of “intentional misconduct or reckless disregard of the rights of an insured or a claimant” by the insurance company that would support an award of punitive damages. Wittmer v. Jones, 864 S.W.2d 885, 890 (Ky.1993) (describing this standard as that of “outrageous” conduct by the insurance company); United Services Auto. Ass’n v. Bult, 183 S.W.3d 181, 186 (Ky.Ct.App.2003) (describing the threshold showing as “high indeed”). After meeting this initial showing, Phelps must establish the following three elements of a bad-faith claim:
(1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.
Wittmer, 864 S.W.2d at 890 (internal quotation marks omitted); accord Motorists Mut., 996 S.W.2d at 452; Med. Protective Co. v. Wiles, — S.W.3d -, -, 2011 WL 2420011, at *6 (Ky.Ct.App. Oct. 21, 2011). Oddly, the second and third elements of this test depend on evidence similar to the threshold inquiry. King, 54 Fed.Appx. at 838.
*732 “The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable.” Farmland Mut. Ins. Co. v. Johnson, 36 S.W.3d 368, 376 (Ky.2000) (internal quotation marks omitted). Evidence about problematic “settlement behavior during litigation” may be considered as part of this inquiry. Knotts, 197 S.W.3d at 517, 522-23 (internal quotation marks omitted).
The Kentucky Supreme Court has cautioned insurance companies that “coming up with an amount that is within the range of possibility is not an absolute defense to a bad faith case.” Farmland Mut., 36 S.W.3d at 376 (internal quotation marks omitted); cf. Wittmer, 864 S.W.2d at 892 (suggesting that a low offer might serve as evidence of bad faith). To comply with their obligations under the statute, insurers “should not force an insured to go [through] needless adversarial hoops to achieve [her] rights under the policy. [They] cannot lowball claims or delay claims hoping that the insured will settle for less.” Farmland Mut., 36 S.W.3d at 376 (internal quotation marks omitted).
But “mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or deception .... or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage.” Motorists Mut., 996 S.W.2d at 452-53 (citation omitted). Nor is the insurer’s below-policy-limits offer considered evidence of bad faith per se, particularly where “the claimants never demanded payment of the policy limits or any other sum.” Id. at 453 (emphasis omitted); see also Coomer, 172 S.W.3d at 395 (noting that the UCSPA does not require that settlement offers “always provide wholly accurate or complete compensation for an injury”). And an insurer may refuse a demand exceeding the policy limits without running afoul of the UCSPA. Motorists Mut., 996 S.W.2d at 453.
In addition, an insurer is entitled to challenge a claim through litigation if the claim is “fairly debatable,” Empire Fire & Marine Ins. Co. v. Simpsonville Wrecker Serv., Inc., 880 S.W.2d 886, 889-90 (Ky.Ct.App.1994), on either “the law or the facts.” Wittmer, 864 S.W.2d at 890 (internal quotation marks omitted). The Kentucky Supreme Court revisited the definition of “fairly debatable” in Farmland Mutual, which clarified that “Empire Fire does not stand for the proposition ... that a disputed factual matter requires dismissal of a bad faith claim as a matter of law” and explained that “the existence of jury issues on the [underlying] contract claim does not preclude the bad faith claim.” Farmland Mut., 36 S.W.3d at 375. It distinguished Empire Fire as a case involving unresolved legal questions about the insurer’s liability. Id. Farmland Mutual then held that “although elements of a claim may be ‘fairly debatable,’ an insurer must debate the matter fairly” and “still is obligated under the KUSCPA to investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner.” Id. Whether a claim may be considered “fairly debatable” is a question of fact for the jury. Id. at 376.
Finally, we note that our dissenting colleague’s disagreement with the reversal of summary judgment in this case is primarily based on the “intentional misconduct or reckless disregard” standard for bad faith set forth in Wittmer, 864 S.W.2d at 890. We acknowledge that the Kentucky cases still recognize Wittmer’s punitive-damages *733 standard despite the Kentucky Supreme Court’s later pronouncement that “the appropriate inquiry is whether ... the insurer acted unreasonably,” Farmland Mut., 36 S.W.3d at 375 (internal quotation marks omitted). See, e.g., Wiles, — S.W.3d at ---, 2011 WL 2420011, at *7-9. This strikes us as confusing because a claim will obviously meet Farmland’s lower standard of “unreasonableness” if it has first met Wittmer’s higher standard of “reckless disregard.” Wittmer’s threshold inquiry thus appears to render superfluous the merits inquiry into an insurance company’s alleged bad faith. In any event, this seems to be the current state of Kentucky law.
But even after acknowledging that Phelps has to meet Wittmer’s higher threshold standard, we believe that the facts here would allow reasonable jurors to so find. This is not to say that they must — or even that they will — find for Phelps, but simply that we believe that the district court erred in concluding that no reasonable juror could find that Phelps has met this standard based on the analysis set forth in Part II.C. below.
C. Summary judgment on Phelps’s UCSPA claim was improper
The district court granted summary judgment for State Farm because it concluded that Phelps had failed to present sufficient evidence that State Farm acted unreasonably in the processing of her claim. See Farmland Mut., 36 S.W.3d at 375. But the district court’s opinion draws inferences that favor State Farm rather than Phelps, and it failed to consider — or explain why it did not consider— Phelps’s expert-witness testimony. In our view, Phelps presented sufficient evidence to raise a genuine dispute as to whether State Farm violated the UCSPA in handling her claim.
First, State Farm’s initial offer of $25,000 was just barely above the low end of both its own evaluation of the claim ($24,620 to $49,620) and Phelps’s documentation of medical and wage-loss costs ($22,-620.22). The offer failed to reasonably account for Phelps’s pain and suffering or future wage loss. Although State Farm argues that it was not required to include these items in its settlement offer because Phelps had not provided any proof of her pain and suffering or future wage loss, that does not excuse State Farm’s failure to include an approximate amount for these damages based on a likely jury verdict. See Farmland Mut., 36 S.W.3d at 375-76 (explaining that an insurer “cannot lowball claims ... hoping that the insured will settle for less,” and it instead must “attempt to settle the claim in a fair and reasonable manner” (internal quotation marks omitted)); Motorists Mut., 996 S.W.2d at 454 (cautioning that, although the “UCSPA does not require that a claim be evaluated, or that it be evaluated correctly,” it does require “that a good faith attempt be made to effectuate a prompt, fair and equitable settlement”). And State Farm has offered no other explanation for its low offer. Whether State Farm acted reasonably in failing to include these damages in its initial settlement offer thus presents a question of fact for the jury.
Another ground on which a jury could reasonably find that State Farm exhibited bad faith is the extensive delay of nearly three years before Phelps’s claim was settled. See id. at 376 (providing that an insurer “cannot ... delay claims”). Several cases have determined that delays of substantially shorter length constitute more than “mere delay” and instead may serve as evidence of bad faith. See Med. Protective Co. v. Wiles, — S.W.3d -, -, 2011 WL 2420011, at *9 (Ky.Ct.App. Oct. 21, 2011) (involving a delay of 27 *734 months between the injury and the initial settlement offer); King v. Liberty Mut. Ins. Co., 54 Fed.Appx. 833, 837-38 (6th Cir.2003) (involving a delay of 18 months from the date of a follow-up inquiry about the settlement through the date that the company finally checked its purged files). Although the early months of the claims process — from September 2003 through February 2004 — may be attributed to the time needed for a reasonable investigation, a legitimate question arises as to whether the delay involved in obtaining records from Phelps’s 1999 injury was reasonable. State Farm first noted this earlier injury in its February 11, 2004 log notes, but there is no evidence that records were requested from Phelps until September of that year. There is no explanation in the record for this six-and-a-half month delay beyond the fact that the claims adjuster was replaced for the second time in the interim. Cf. King, 54 Fed.Appx. at 837-38 (concluding that an 18-month delay for investigatory purposes was unreasonable).
State Farm’s position that this information was necessary to evaluate Phelps’s claim may also be construed as a delay tactic. Viewing the facts in the light most favorable to Phelps, the settlement package submitted in March 2004 included all of the information needed to settle her claim. The jury may infer that State Farm raised the prior-injury issue at this time in order to delay making a settlement offer. This inference is bolstered by the fact that State Farm had access to databases reporting prior insurance claims and could have uncovered the existence of Phelps’s 1999 injury well before receiving her allegedly deficient medical records. Similarly, adjustor Nieses’s refusal to complete an initial valuation before receiving these records — on the ground that such an evaluation would be “premature” (despite the fact that settlements are often reached at premature stages in litigation) — could also be considered a delay tactic.
Phelps’s case further involves some general evidence of delay tactics, some questionable delays in the processing of her claim, and a nearly three-year delay before payment. We recognize, of course, that some of the delay in this case is due to the apparent lack of diligence by Phelps’s own counsel. But the majority of the delay, when viewed in the light most favorable to Phelps, seems fairly attributable to State Farm.
Another inference of bad faith arises from State Farm’s prolonged refusal to disclose its policy limits, particularly after Carroll made a demand that far exceeded the limit. State Farm disputes whether any request to disclose policy limits was ever made, but the district court was obligated to view the record in the light most favorable to Phelps when considering State Farm’s motion for summary judgment. In addition, State Farm argues that it was not required under Kentucky law to disclose its policy limits, a contention for which State Farm offers no support but to which Carroll conceded during his deposition. But even if an insurer is not generally obligated to disclose its policy limits, the failure to promptly offer its limits as soon as it knows or should have known that a reasonable evaluation of the claim is in excess of the limit could support an inference that State Farm was not attempting to negotiate in good faith. Cf. Coppage v. Fireman’s Fund Ins. Co., 379 F.2d 621, 624 n. 3 (6th Cir.1967) (declining to hold under Tennessee law that “an insurer has a general duty to disclose policy limits,” but determining that “on the record before us, the withholding of this information was a circumstance which the jury could consider on the question of bad faith”).
*735 The record further includes some evidence of troubling claims-handling practices by State Farm both in this case and in general. These include switching claims adjustors four times without explanation, habitually making offers at the low end of valuation ranges, refusing to increase an offer without documentation of additional damages, failing to ask Phelps to submit to an independent medical examination, and failing to include facts in the claim file that would support a jury verdict in Phelps’s favor. Two of these practices — extending low offers and refusing to increase the valuation range — find support in the deposition testimony of State Farm’s own claims adjustors.
Finally, we note the critique of State Farm’s handling of the claim in question that is documented in the reports from Phelps’s expert witnesses Fye and Huff, which the district court totally failed to consider. State Farm did not move to exclude the testimony of these experts, and Phelps relied on their reports in her response to State Farm’s motion for summary judgment. The district court therefore had a duty to at least address their reports. See Fed.R.Civ.P. 56(c)(3) (mandating that “[t]he court need consider only the cited materials” in the parties’ briefs); see also Logan v. Denny’s Inc., 259 F.3d 558, 568 (6th Cir.2001) (finding that “the district court’s analysis ... [is] in complete contravention to the requirement that the evidence — all of the evidence — be viewed in the light most favorable to the nonmoving party” on summary judgment). Its failure to do so is troubling, especially because the opinions of the two expert witnesses raise a genuine dispute as to State Farm’s compliance with the UCSPA in this case.
All of this is not to say that a jury will ultimately find that State Farm violated the UCSPA by processing Phelps’s claim in bad faith. But the evidence presented by Phelps is sufficient to raise a genuine dispute as to this issue. The proof, in other words, is not “so one-sided that [State Farm] must prevail as a matter of law.” See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
III. CONCLUSION
For all of the reasons set forth above, we REVERSE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.